CCS INVESTORS, LLC, and Preservation Delaware, Inc., Respondents Below, Appellants,

v.

David H. BROWN, P. James Hahn, Kathryn A. Pincus, and Susan W. Soltys, Petitioners Below, Appellees.

No. 410, 2008.

Supreme Court of Delaware.

Submitted: June 4, 2009.
Decided: July 16, 2009.
Corrected: Aug. 10, 2009.

Wendie C. Stabler, Esquire, and Michael A. DeNote, Esquire, Saul Ewing, LLP, Wilmington, Delaware, and Michael F. Bonkowski, Esquire (argued), Cole, Schotz, Meisel, Forman & Leonard, P.A., Wilmington, Delaware, for appellant, CCS Investors, LLC.

Douglas M. Hershman, Esquire, and Scott G. Wilcox, Esquire (argued), Bayard, P.A., Wilmington, Delaware, for appellant, Preservation Delaware, Inc.

Jeffrey S. Goddess, Esquire (argued), Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware, for appellees.

William E. Manning, Esquire, and Richard A. Forsten, Esquire, Buchanan, Ingersoll & Rooney, P.C., Wilmington, Delaware, amicus curiae for National Trust for Historic Preservation.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

HOLLAND, Justice.

This is an appeal from the Superior Court's final judgments denying a motion to dismiss and reversing a decision of the City of Wilmington Zoning Board of Adjustment ("ZBA"). In August 2006, the ZBA granted a use variance to CCS Investors, LLC ("CCS"), permitting CCS to develop the Gibraltar Estate into commercial office space. The Gibraltar Estate is a historic mansion and gardens at 1301 Greenhill Avenue in Wilmington. It is the former home of the Hugh Rodney Sharp family and is now owned by the non-profit organization Preservation Delaware, Inc. ("PDI"). PDI and CCS are the appellants/respondents-below.

The appellees/petitioners-below are David H. Brown, P. James Hahn, Kathyrn A. Pincus and Susan W. Soltys, residents of the surrounding neighborhoods who oppose the development of Gibraltar into office space.[1] In October 2006, the appellees/petitioners-below filed a petition for a writ of certiorari in the Superior Court seeking judicial review of the ZBA's decision to grant the variance. The petition named only the ZBA, not PDI or CCS.

The ZBA filed a motion to dismiss for failure to name a necessary party, asserting that PDI, as the owner of Gibraltar, and CCS, as the prospective developer and variance applicant, were indispensable to the appeal. In June 2007, the Superior Court denied the motion to dismiss and granted the motion of the petitioners-below to amend the caption of the petition and add PDI and CCS as parties.[2] In July

---

1. Brian Wong was also a petitioner-below but he was removed as petitioner on May 3, 2007.

2. *Brown v. City of Wilmington Zoning Bd. of Adjustment*, C.A. No. 06A–10–005, 2007 WL 1828261 (Del.Super. Ct. June 25, 2007).

2008, the Superior Court reversed the ZBA's decision to grant the use variance on the grounds that the ZBA improperly granted the variance based on its finding of a hardship that was of the applicant's own making.[3]

In this appeal, CCS and PDI make four arguments. First, they contend that the Superior Court committed reversible error when it denied their motion to dismiss the appeal of the ZBA decision. They argue that their motion should have been granted because the petitioners-below failed to join the property owner, PDI, an indispensable party to the appeal. Second, they assert that the Superior Court committed reversible error when it permitted the petitioners-below to amend their petition to add CCS as a party after applying the relation back doctrine under Superior Court Civil Rule 15. The appellants assert that the Superior Court erred when it found that the "notice" and "mistake" requirements of the relation back doctrine had been satisfied. Third, they argue that the Superior Court erred when it reversed the decision of the ZBA based on the *per se* bar against self-imposed hardships. The appellants assert that CCS did not create the hardship and that the ZBA properly found that all of the elements of the unnecessary hardship test had been met. Fourth, they maintain that the Superior Court's adoption of the *per se* bar to a use variance when the hardship is self-imposed "ignores the public policy underlying the regulatory scheme; ignores the public policy favoring the productive use of land; and ignores the consequences a *per*

*se* bar would have on the implementation of future conservation easements."

We held in *Hackett,* and we now reaffirm, that the property owner is an indispensable party to an appeal from a decision of a municipal zoning board.[4] Because the petition in this case failed to name the landowner—PDI—as a party, we have concluded that the judgment of the Superior Court must be reversed. The petition for a writ of *certiorari* seeking judicial review of the ZBA's decision should have been dismissed for failure to name an indispensable party—PDI. Accordingly, the decision of the ZBA granting CCS the variance should not have been reversed and stands on its merits. In addition, we note for future guidance that there is no *per se* bar against self-imposed hardships in Delaware.

### History of Gibraltar

The Gibraltar Estate is located on approximately seven acres at the corner of Pennsylvania and Greenhill avenues in Wilmington.[5] Its gardens were designed by landscape artist Marion Coffin, who designed most of the public open spaces at Winterthur and the University of Delaware. The mansion at Gibraltar was built in 1844 by industrialist John Brinkle. The 17,000–square–foot, slate and granite house became the home of Hugh Rodney Sharp in the early 20th century. Sharp expanded the mansion considerably. Gibraltar is bordered on all sides by a stone wall, making it one of the few remaining walled estates in Wilmington. It is on the National Registry of Historic Places. Sit-

**3.** *Brown v. City of Wilmington Zoning Bd. of Adjustment,* C.A. No. 06A–10–005, 2008 WL 2943390 (Del.Super.Ct. July 21, 2008).

**4.** *Hackett v. Bd. of Adjustment of Rehoboth Beach,* 794 A.2d 596 (Del.2002).

**5.** These facts are taken substantially from the Superior Court's July 2008 memorandum opinion. *See Brown v. City of Wilmington Zoning Bd. of Adjustment,* C.A. No. 06A–10–005, 2008 WL 2943390 (Del.Super.Ct. July 21, 2008).

uated at the edge of the Highlands neighborhood, Gibraltar is in an area zoned R–1 (residential), although both commercial and residential uses exist in the surrounding neighborhoods.

Following the death of Hugh Rodney Sharp, the Sharp family intended to demolish the mansion and develop the Gibraltar Estate for townhouses or single family homes. The neighbors in the surrounding community opposed large-scale development of the property and, following a statewide lobbying effort, the Wilmington City Council passed a resolution encouraging the State of Delaware to make funding available for the acquisition of Gibraltar. In 1997, the Sharp family conveyed the property in fee simple to PDI in exchange for a $1 million grant from the State of Delaware Open Space Council. At the same time, the Sharp family granted the State a conservation easement that limits future development of the property. As a result, PDI became the legal owner of Gibraltar, subject to the terms of the conservation easement.

The easement was intended to limit development of Gibraltar while ensuring its preservation and viability. It precludes the current owner and any future owners from demolishing the mansion and surrounding structures, requires that the gardens stay preserved and limits the size and location of any new construction if the land is redeveloped. New construction may only be located on the north side of the property near 16th Street. The entire south side of the property—the front lawn bordering Pennsylvania Avenue—is protected as open space, and construction and development is prohibited. Restoration work on the property must be conducted in accord with the Standards for Historic Preservation.

When PDI acquired Gibraltar, it raised funds to renovate and restore the gardens, which remain open to the public free of charge. PDI never intended to restore the mansion, however. Instead, PDI sought a developer to restore the mansion and provide an adaptive reuse that would generate a consistent income to maintain the property. The costs of restoration and upkeep were estimated at approximately $5 million for the mansion alone, an amount that exceeded any return if the mansion were sold as a single-family residence.

In 2000, PDI contracted with Someplace Different, Inc. ("SDI") to develop the property into a bed and breakfast. The plans included an inn and a restaurant, as well as the construction of a new building with 14 additional rooms. SDI needed a use variance from the ZBA to develop the bed and breakfast. The ZBA unanimously granted the use variance in January 2000. SDI, however, was unable to secure the necessary funding for the project and had to withdraw its proposal. PDI sought other developers for a bed and breakfast but found none.

In 2004, PDI sought new adaptive reuse proposals and eventually selected the proposal from CCS to develop Gibraltar into office space. CCS proposed to use the two existing structures and to build a new two-story, 10,000–square–foot structure to provide a total of approximately 40,000 square feet of office space for a maximum of three tenants—one per building. The plans would accommodate parking for 97 cars, with 23 spaces underground, below the new office building. The main entrance and exit from Gibraltar would be at the corner of Greenhill Avenue and 16th Street, so as not to cause additional traffic on Pennsylvania Avenue.

### ZBA Grants Use Variance

In May 2006, CCS applied to the ZBA for a use variance to develop the property

into commercial office space. The application form names CCS as the applicant and PDI as the property owner. The ZBA held a hearing on the application on August 9, 2006.

At the hearing, Rebecca Sheppard, a member of PDI's Board of Trustees and chair of the board's Gibraltar Redevelopment Committee, testified that PDI's "advocacy efforts on behalf of [Gibraltar] began with a stipulation that an economically self-sustaining reuse of the building ... would take place once it was acquired." Sheppard testified that "[t]he idea was to develop an adaptive reuse on the site that would generate a financial stream to support the property." She said that PDI received nine proposals to develop Gibraltar, including plans for townhouses, educational facilities and commercial enterprises such as medical buildings, restaurants and shops. But, she said, CCS's proposal was the only viable option.

The testimony at the hearing also revealed that the gardens have been restored and are now in good condition, but the mansion is in disrepair. Witnesses described wood rot, plaster and water damage, roof damage, asbestos, lead paint and mold throughout the house. The main floor is inhabited by animals. Vandals regularly cause damage to the interior and exterior of the house. Given the extensive damage, the estimated cost to restore Gibraltar to its former condition is between $9 million and $10 million. Sheppard testified that if CCS's plans do not go forward as proposed, the mansion will continue to deteriorate and the cost to restore the mansion will increase.

CCS presented evidence that a commercial adaptive reuse, as opposed to a residential project, was necessary to save Gibraltar. Adrian Fine, director of the Northeast Field Office for the National Trust for Historic Preservation, testified that commercial adaptive reuse plans are effective and, in fact, the preferred method for preserving historic buildings that can no longer be used for their intended purposes. Ted Williams, the site engineer, testified that if there was not an easement on the property, 18 residential homes could be built at Gibraltar. With the easement restrictions, only two residential homes could be built. Neil Killian, a commercial real estate broker, testified that a residential subdivision of Gibraltar was not an economically viable option because of the easement. He testified as follows:

> I [looked] at some of the recent, comparable home sales in and around the Gibraltar site, as well as some recent home lot sales in and around the area, and essentially what it reflects is that homes in the area can range anywhere [from] half a million to $6 million and lots can range anywhere from the low $100,000s to as high as $600,000, and just given those parameters and based on [Ted Williams'] analysis of what can actually be done on this site, in a residential capacity, it's very easy to discern that residential is not adequate to generate the return needed to salvage the mansion and gardens.

Killian further explained that a 10,000–square–foot office building, as opposed to a smaller structure, was needed to generate a rate of return for the developer that would justify the risk of undertaking the project. Wendie Stabler, counsel for CCS, explained that through various architectural designs and distribution of the parking lots around the grounds, the project would comport with the residential nature of the neighborhood.

The ZBA approved the variance that evening by a vote of two to one, and issued a written decision on September 12, 2006. The decision states:

[T]he Board having held a public hearing and having heard all the testimony and considering the location, is of the majority opinion that the application could be granted without substantially impairing the general purpose and intent of the Building Zone Ordinance and that it would not adversely affect the character of the neighborhood and there being circumstances of hardship or exceptional practical difficulty . . .

The decision then lists the following factors, which the ZBA found to be "circumstances of hardship or exceptional practical difficulty" that justified the variance:

1) Given the renovation costs, the existing building cannot reasonably be used in a manner permitted by the current zoning, and;

2) the buildings existing on the premises are in a seriously deteriorating condition and the approval of the variance would allow for their restoration, and;

3) the buildings on the premises have significant historic value and have been, and would continue to be, an asset to the neighborhood and the city in general, and;

4) considering that there are development restrictions limiting the use of the property that, while self-imposed, were specifically instated to prevent the destruction of the buildings and grounds, to prevent large scale redevelopment of the site, and to promise the restoration of the historic structures and gardens, and;

5) considering that it had been understood, at the time of the imposition of the restrictions, that some alternative use would be required to sustain and fund the restoration, and;

6) considering that the Board had previously approved such an alternative use (for a hotel/restaurant/bed and breakfast) and that the current proposal is reasonably similar in scope, and;

7) considering that the property owner has considered a number of potential alternative uses, over a period of years; and

8) considering that the proposed new structures have been designed to limit their visibility to the surrounding area and to be compatible with the residential structures in the area, and;

9) considering that amply parking is to be provided to accommodate the use and that entrances and exits have been designed to funnel traffic to arterial streets and to minimize traffic impact on the residential neighborhood streets, and;

10) considering that there are other commercial and office uses in the area, such that the proposed use would not be entirely inconsistent with the character of the neighborhood.

The member of the ZBA who voted against the variance explained that the "one thing that really concerns me in this particular case is when a property owner puts restrictions essentially on himself, which really gives the property owner a very hard time in conforming to the zoning code, and I think in large part, that's what happened here."

The variance gives CCS the right to convert the property for office use and to construct a new 10,000–square–foot office building next to the existing mansion.

### Counsel's Letter on Behalf of CCS

On September 13, 2006, Stabler, the attorney who represented CCS in the variance application before the ZBA, sent a letter on behalf of CCS to Joseph G. DiPinto, economic development director for the City of Wilmington. Stabler sent a carbon copy of the letter to counsel for the appellees/petitioners-below Jeffrey S. God-

dess and to PDI's president and its executive director.

In the letter, Stabler referred to CCS as "my client" multiple times. She wrote that "we received the written decision of the City of Wilmington Board of Adjustment yesterday ... and are looking forward to obtaining the remaining approvals over the next few months. I did try to reach out to Jeff Goddess but he has not returned my call." She wrote that she hoped to reopen negotiations between CCS and the City about CCS's plans to develop Gibraltar and stated that "we hope we can count on the City's continued support as the project proceeds." She also stated that "my client has the Gibraltar property *under contract*" and "is the EQUITABLE OWNER of the property." She said CCS had "spent hundreds of thousands in engineering and other fees in a good faith effort to get to this point." Finally, she concluded that "CCS would prefer to have the funds it is devoting to hearings, superfluous and duplicative conservation overlay proposals and a potential appeal to be devoted to the best and most successful historic adaptive reuse and rehabilitation project that the City has ever seen."

### Appeal of ZBA's Decision

On October 12, 2006, the appellees/petitioners-below filed a petition for a writ of *certiorari* in the Superior Court seeking review of the ZBA's decision, pursuant to title 22, section 328 of the Delaware Code [6] and Superior Court Civil Rule 72.[7] The caption of the petition named only the ZBA as the respondent and did not name

PDI or CCS as parties or as respondents in either the caption or the body of the petition. The body of the petition did describe the relationship between CCS and PDI, and it did state that CCS applied for and received the variance. The petition was filed one day before the appeal period expired.

That same day, Goddess, counsel for the appellees/petitioners-below, sent Stabler, counsel for CCS, an email with a copy of the petition attached. The subject line of the email is: "Gibraltar / appeal." The email states: "Wendie—Attached is a copy of the appeal (i.e., petition for statutory writ of *certiorari*) which I filed earlier this afternoon." The filename for the attached petition is: "Gibraltar ZBOA appeal (Filed)."

On October 27, 2006, the appellees/petitioners-below filed a praecipe with the Superior Court Prothonotary requesting that a summons be sent to the Sheriff for service of the petition upon the ZBA and upon CCS, in care of its attorney, Stabler. The ZBA was served on November 13, 2006, and the writ was returned on November 30, 2006. The Sheriff attempted to serve Stabler on November 6, 2006, but she refused service because she was not the registered agent for CCS.

### Motion to Dismiss

On October 31, 2006, the ZBA moved to dismiss the petition pursuant to Superior Court Civil Rule 12(b)(7).[8] The ZBA argued that the petition must be dismissed for failure to join CCS and PDI, indispensable parties under Superior Court Civil

---

6. *See* Del.Code Ann. tit. 22, § 328 (governing *certiorari* appeals from a Municipal Zoning Board to the Superior Court).

7. Del.Super. Ct. Civ. R. 72 (governing appeals from all administrative boards).

8. Del.Super. Ct. Civ. R. 12(b)(7) (*"How presented.* Every defense, in law or fact, to a claim for relief in any pleading ... shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ... (7) failure to join a party under Rule 19.*"*).

Rule 19.[9] The ZBA asserted that this Court addressed similar facts in *Hackett v. Board of Adjustment of Rehoboth Beach* and affirmed the Superior Court's dismissal of a petition for a writ of *certiorari* that failed to name a necessary party in connection with an appeal from an administrative agency to the Superior Court.[10] The ZBA argued that CCS and PDI were "affected parties" under *Hackett* and therefore the petition must be dismissed because CCS and PDI had not been named.

In arguing against dismissal, the petitioners-below asserted that Delaware follows the "modern rule" with regard to the technical requirements of an appeal. They asserted that under the modern rule, "courts functioning in an appellate capacity should permit appeals to be decided on the merits, notwithstanding non-compliance with the technical niceties of the appeal procedure."[11] The petitioners claimed that in *Silvious v. Conley*, this Court expressly extended the modern rule to appeals brought in the Superior Court.[12]

They also argued that the petition should not be dismissed because they complied with the requirements of section 328[13] and Rule 72.[14] They claimed that the petition satisfied section 328 because they timely filed a verified petition with the Superior Court that clearly set forth the bases for their contention that the ZBA proceeding was legally flawed and the ZBA's conclusions were erroneous.[15] They claimed the petition satisfied Rule 72 because it named the petitioners, designated precisely the order appealed from, stated the grounds for appeal, named the Superior Court, and was signed by counsel for the petitioners-below.[16] According to

---

**9.** Del.Super. Ct. Civ. R. 19.

**10.** *See Hackett v. Bd. of Adjustment of Rehoboth Beach*, C.A. No. 001–11–001 (Del.Super.Ct. May 11, 2001), *aff'd, Hackett v. Bd. of Adjustment of Rehoboth Beach*, 794 A.2d 596 (Del.2002);

**11.** *See Hackett v. Bd. of Adjustment of Rehoboth Beach*, 794 A.2d 596, 598 (Del.2002).

**12.** *See Silvious v. Conley*, 775 A.2d 1041 (Del. 2001).

**13.** Del.Code Ann. tit. 22, § 328.

**14.** Del.Super. Ct. Civ. R. 72.

**15.** Section 328 provides:

**Appeal to the Superior Court from board's decision**

(a) Any person or persons, jointly or severally aggrieved by any decision of the board of adjustment, or any taxpayer or any officer, department, board or bureau of the municipality may present to the Superior Court a petition, duly verified, setting forth that such decision is illegal, in whole or in part, specifying the grounds of the illegality. Such petition shall be presented to the Court within 30 days after the filing of the decision in the office of the board.

(b) Upon the presentation of the petition, the Court may allow a writ of *certiorari* directed to the board to review such decision of the board and shall prescribe therein the time within which a return thereto must be made and served upon the realtor's attorney, which shall not be less than 10 days and may not be extended by the Court. The allowance of the writ shall not stay proceedings upon the decision appealed from, but the Court may, on application, on notice to the board and on due cause shown, grant a restraining order.

(c) The Court may reverse or affirm, wholly or partly, or may modify the decision brought up for review. Del.Code Ann. tit. 22, § 328.

**16.** Superior Court Civil Rule 72 relevantly provides:

*Notice of appeal.* The notice of appeal shall specify the parties taking the appeal, shall designate the order, award, determination, or decree, or part thereof appealed from; shall state the grounds of the appeal; shall name the Court to which the appeal is taken; and shall by signed by the attorney for the appellants. Del.Super. Ct. Civ. R. 72(c).

the petitioners, Rule 72 does not require the petitioners to name the party or parties against whom the appeal is taken.

They also argued that the Superior Court forms and Civil Rules, both of which are provided on the court's website, are "misleading because both speak of a singular, or solitary defendant in error, and suggest that the solitary entity in the caption should be the board of adjustment." The petitioners-below contended that the petition complied with the published forms by naming the ZBA as the solitary defendant in error and their compliance with the forms should satisfy the requirements for Superior Court practice and procedure.[17] Finally, the petitioners argued that this Court's decision in *Hackett* relied on the Superior Court's decision in *Sussex Medical Investors, L.P. v. Delaware Health Resources Board* and the facts in *Sussex Medical* were distinguishable from the facts of this case.[18]

### Superior Court Denies Motion to Dismiss

The Superior Court denied the motion to dismiss. The Superior Court found that PDI was not a necessary party to the appeal and that, even if PDI was a necessary party, its interests could be represented by CCS. The Superior Court found that CCS was a necessary party to the appeal, but that the petitioners-below could amend their petition to add CCS as a party under the relation back doctrine and Superior Court Civil Rule 15(c).[19] The Superior Court then granted the petitioners' motion to amend the caption of their petition to name both CCS and PDI as parties.

The Superior Court explained that Superior Court Civil Rule 12(b)(7) provides that the Superior Court may dismiss a claim for relief for failure to join a party pursuant to Superior Court Civil Rule 19.[20] Rule 19 provides for the joinder of persons needed for just adjudication.[21] The Superior Court considered "whether or not there is any room for forgiveness" when a petitioner for a writ of *certiorari* seeking the Superior Court's review a decision of a zoning board "fails to comply with the letter of the[ ] standards" governing amendments to appellate proceedings.[22]

First, the Superior Court stated: "It is well-settled Delaware law that appeals should be decided on the merits rather than 'nice technicalities of practice.'"[23] The Superior Court noted, however, that different standards govern amendments to appellate proceedings, depending on whether the appeal is brought in the Supreme Court[24] or in a trial court. The

17. See *Gordy v. Preform Bldg. Components, Inc.,* 310 A.2d 893, 897 (Del.Super.Ct.1973).

18. See *Sussex Med. Investors, L.P. v. Delaware Health Res. Bd.,* 1997 WL 524065 (Del.Super.Ct. April 8, 1997).

19. Del.Super. Ct. Civ. R. 15(c) (governing relation back of amendments).

20. Del.Super. Ct. Civ. R. 19 (governing joinder of parties).

21. Del.Super. Ct. Civ. R. 19(a) (providing the rules for "persons to be joined if feasible").

22. *Brown v. City of Wilmington Zoning Bd. of Adjustment,* C.A. No. 06A–10–005, at 11, 2007 WL 1828261 (Del.Super. Ct. June 25, 2007).

23. *Id.* (quoting *Episcopo v. Minch,* 203 A.2d 273, 275 (Del.1964)) (stating that "appeals as well as trials should, where possible and where the other side has not been prejudiced, be decided on the merits and not upon nice technicalities of practice").

24. The Superior Court explained that with regard to appeals brought in the Supreme Court, this Court adopted the modern rule that "de-emphasizes the technical procedural aspects of appeals and stresses the importance of reaching and deciding the substan-

Superior Court explained that amendments to appeals brought in the trial courts are governed by Rules 15 and 19. As an example, the Superior Court cited *Council of Civic Organizations of Brandywine Hundred v. New Castle County*, in which this Court affirmed the Court of Chancery's dismissal of an appeal for failure to join a necessary party under Court of Chancery Rules 15 and 19, after the time to perfect the appeal had expired. The Court of Chancery found that the action could not proceed because the unnamed party was indispensable to the appeal.[25] In *Sussex Medical*, the Superior Court dismissed an appeal for failure to join a necessary party after applying Superior Court Civil Rules 15 and 19.[26]

Second, the Superior Court determined that this Court's decision in *Hackett* established a standard for joinder in *certiorari* appeals.[27] In *Hackett*, the Superior Court applied Superior Court Civil Rules 15 and 19 to determine whether the omission of a party to a *certiorari* appeal from a decision of the Board of Adjustment of Rehoboth Beach was an amendable defect.[28]

The Superior Court dismissed the appeal because the petitioner failed to name a necessary party—the property owner/successful applicant before the Board of Adjustment.[29] This Court affirmed, holding that the landowner is an "affected party" that must be named in an appeal of a decision of a board of adjustment affecting the landowner's property.

The Superior Court noted that the facts of this case are "very similar" to the facts of *Hackett* because both cases involve *certiorari* appeals to the Superior Court from zoning board decisions, both omitted the successful applicant and both petitioners failed to denote the omitted party as a party in the body of the petition.[30] The Superior Court stated that this case does not present a simple defect in the caption and that the issue in this case "is not whether the caption can be corrected so that a previously named party can be properly identified, but whether an entirely new party (PDI and/or CCS) can be joined under Rules 15 and 19 after the expiration of the time for appeal." [31]

tive merits of appeals whenever possible." *Id.* at 11–12 (citing *State Pers. Comm'n v. Howard*, 420 A.2d 135, 137 (Del.1980); *Weston v. State*, 554 A.2d 1119, 1122 (Del.1989) (holding that *Howard* should be applied where the amendment sought is minor and/or technical)). The two-part test set forth by this Court in *State Personnel Commission v. Howard* to determine whether an appellant's omission of a party in the notice of appeal is fatal is: "(1) Such omission in the notice of appeal will not cause the appeal to be dismissed unless the omission is substantially prejudicial to a party in interest; and (2) The burden rests upon the appellant to establish the absence of such substantial prejudice." *Id.* at 12 (quoting *State Pers. Comm'n v. Howard*, 420 A.2d at 137).

25. *Id.*

26. *Id.* at 13–14 (citing *Sussex Med. Investors, L.P. v. Delaware Health Res. Bd.*, 1997 WL 524065, at *3) (noting that appeals to the

Superior Court are not governed by the same standard as appeals to the Supreme Court but stating that the Superior Court is "nevertheless guided by the general holding of *Howard* that appellate courts should 'decide the substantive merits of appeals whenever possible' ").

27. *Id.* at 15.

28. *Id.* at 18.

29. *Id.* at 17 (citing *Hackett v. Bd. of Adjustment of Rehoboth Beach*, C.A. No. 001–11–001 (Del Super. Ct. May 11, 2001)).

30. *Id.* (citing *Hackett v. Bd. of Adjustment of Rehoboth Beach*, 794 A.2d 596, 598 (Del. 2002)).

31. *Id.*

The Superior Court explained that under *Hackett*, it must determine first whether PDI and CCS are necessary parties to the appeal pursuant to Rule 19(a). Then, if the court found that either PDI or CCS was a necessary party, it must determine whether the petitioners can join that party by amendment under Rule 15(a). The Superior Court further explained that an amendment to the notice of appeal may relate back to the date of the original filing *only if* the petitioners satisfy the three requirements of Rule 15(c). If it is not possible to join PDI and/or CCS, then the Superior Court explained that it must determine whether it can proceed without the missing party or if it must grant the motion to dismiss because the missing party is indispensable under Rule 19(b).

Third, the Superior Court explained that a petitioner for a *certiorari* appeal must comply with certain pleading requirements, such as "notice to a party affected by the administrative ruling, either directly or through a designated agent." [32] The Superior Court noted that the petitioners in this case complied with the pleading requirements of section 328 and Rule 72. They satisfied section 328 by timely filing a verified petition setting forth the grounds for their appeal of the ZBA's decision. They satisfied Rule 72 by naming the petitioners, designating precisely the order appealed from, stating the grounds of the appeal, naming the Superior Court, and signing the petition. They also complied with the official forms published with the Superior Court Civil Rules by naming the ZBA in the caption of the petition. Therefore, the Superior Court concluded that the petitioners-below had invoked the Superior Court's appellate jurisdiction. [33]

Fourth, the Superior Court considered whether the petitioners complied with Rules 19 and 15. First, the Superior Court found that PDI was not a necessary party to the appeal pursuant to Rule 19(a) because it was not a party to the ZBA proceeding. The Superior Court reasoned that the variance application lists CCS as the *applicant* and that PDI *did not* participate in the ZBA hearing and was not mentioned in the ZBA's written decision granting the variance. The Superior Court stated that "[t]o the extent PDI has an interest in these proceedings, it would be well-represented by CCS."

The Superior Court found that CCS was a necessary party to the appeal pursuant to Rule 19(a) because, like the unnamed parties in *Sussex Medical*, "CCS has a vested interest in this appeal." [34] The court explained that any reversal or modification of the ZBA's decision would affect CCS's right to develop Gibraltar in accord with the variance it obtained.

The Superior Court concluded that the petitioners could amend their petition under Rule 15(c) because they satisfied the three requirements for an amendment to relate back to the original filing date. [35]

**32.** *Id.* at 19–20 (citing *Hackett v. Bd. of Adjustment of Rehoboth Beach,* 794 A.2d at 598).

**33.** *Id.* at 20 (citing *Preston,* 772 A.2d at 791).

**34.** *Id.* at 22 (citing *Sussex Med. Investors, L.P. v. Delaware Health Res. Bd.,* 1997 WL 524065, at *5) (explaining that in *Sussex Medical,* the Superior Court found that the omitted parties to an appeal from a decision of the Delaware Health Resources Board were necessary under Rule 19(a) because "the disposition of th[e] appeal in the absence of the successful applicants may impair or impede their interests significantly").

**35.** Rule 15(c) provides three requirements that must be satisfied before the court may permit the amendments to relate back to filing of the original action:

(1) The claim asserted in the amended pleading must arise out of the same conduct or occurrence set forth in the original pleading;

The Superior Court determined that the first requirement—that the claim asserted in the amended pleading arise out of the same conduct or occurrence set forth in the original pleading—was satisfied because the petitioners proposed amendment relates to the same conduct or occurrence set forth in the original petition, as "the conduct or occurrence that is the subject of this proceeding is the issuance of a use variance by the ZBA to CCS." The court found that "[t]his focus would not change by allowing Petitioners leave to amend the Petition to add CCS as a party."

The Superior Court determined that the second requirement—that the party to be added by the amendment receive notice of the action within the required statutory period—was satisfied because CCS had notice of the institution of the appeal when Goddess sent an email with a copy of the petition attached to Stabler, the attorney who represented CCS at the ZBA hearing. The court explained that it may liberally construe the type or quality of notice, which need not be formal, such as service of process, and need not be in writing.[36]

The court further explained that this Court's holding in *Hackett* did not preclude a finding that notice of the filing of a petition for a writ of *certiorari* to the attorney who represented the party in the hearing before the ZBA was sufficient. Instead, the court stated that *Hackett* held, on those facts, there was no basis in the record "to impute an ongoing attorney-client relationship between [the property owner's attorney in the ZBA hearing] and [the property owner]."[37] The court concluded that there must be evidence of an agency relationship to support constructive notice in the absence of a prior understanding communicated to the petitioner and that in this case, notice to Stabler, the attorney who represented CCS at the ZBA hearing, could be imputed to CCS because "notice to a party's attorney concerning a legal matter will, in certain instances, provide constructive notice to the party,"[38] particularly if the attorney-client relationship has been disclosed. The court stated that a petitioner "may not assume that an ongoing attorney-client relationship exists at the close of an administrative proceeding."[39] But, the court reasoned, if there is evidence that the attorney-client relationship is ongoing *and* a prior understanding of that relationship is communicated to the petitioner, then notice to counsel for the party will be sufficient to satisfy the "notice" prong of 15(c).

The Superior Court concluded that there was a basis in the record to conclude that CCS received notice of the appeal through Stabler, its attorney. The letter that Stabler sent to DiPinto on September 13, 2006, provided evidence that she continued to represent CCS after the ZBA released its decision. Stabler identified CCS as her client in the letter and proposed continuing discussions with the city on behalf of CCS. The court further found that "[h]er refer-

---

(2) The party to be added by the amendment must receive notice of the action within the required statutory period; and
(3) Within the same statutory period, the party to be added to the action must have known or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party sought to be added to the pleading. *Preston v. Bd. of Adjustment of New Castle County,* 772 A.2d 787, 790 (Del.2001).

**36.** *Id.* at 24–25.

**37.** *Id.* at 26 (citing *Hackett v. Bd. of Adjustment of Rehoboth Beach,* 794 A.2d at 598–99).

**38.** *Id.* at 27 (citing *Vance v. Irwin,* 619 A.2d 1163, 1165–66 (Del.1993)).

**39.** *Id.* at 28 (citing *Vance v. Irwin,* 619 A.2d at 1165–66; *Hackett v. Bd. of Adjustment of Rehoboth Beach,* 794 A.2d at 599).

ence to the ZBA decision and her attempt to contact Mr. Goddess further demonstrate that she intended to represent CCS in 'obtaining remaining approvals over the next few months.' " [40]

Finally, the letter provided petitioners with an understanding of an ongoing attorney-client relationship between Stabler and CCS prior to the filing of the petition. Therefore, the court concluded that notice of the appeal to Stabler through Goddess's email could be imputed to CCS. Stabler did not receive the praecipe and the pleading it directed to be served on CCS until after the time for appeal had expired and so the court concluded that the praecipe could not be considered for purposes of notice.

The Superior Court did find the praecipe relevant to the third requirement— that within the same statutory period, the party to be added knew or should have known that but for a mistake concerning the identity of the proper party, the action would have been brought against the party to be added to the pleading. The court considered whether CCS "knew or should have know that, but for a mistake concerning the identity of the proper party, the action would have been brought against CCS." First, the court considered whether the petitioners were mistaken as to the identity of the proper party. Under the strict approach, followed in Delaware, a mistake occurs when the petitioner makes a true mistake as to the identity or name of the proper party as opposed to where the plaintiff merely chose the wrong party to sue. The Superior Court determined that Delaware courts tend to focus on "the reason the moving party failed to include a party in the complaint or petition to determine whether the failure constituted a 'mistake.' " The courts generally decline to find a mistake when the plaintiff cannot demonstrate an intent to include the unnamed party before the limitations period expired but will find a mistake if the plaintiff intended to sue certain parties but was misled as to the identity of those parties.

In this case, the Superior Court concluded, the petitioners were misled by the forms on the Superior Court's website, which indicate that only the ZBA should be named in the caption as the defendant in error. The court concluded that the petitioners' intent to prosecute the appeal against both the ZBA and CCS was well-documented in the record. The petitioners offered evidence of their intent to name CCS as a party to the appeal prior to the expiration of the statutory appeal period in: their praecipe; Goddess' email to Stabler; and the petition itself. The Superior Court stated that the petitioners' counsel was nonetheless "led astray" by the Superior Court's forms, "which clearly (albeit) incorrectly suggest that only the ZBA should be named as the defendant in error." Therefore, the court concluded that the mistake was not inadvertent. The court stated that counsel for the petitioners "deliberately, but *mistakenly*, chose to name only the ZBA in the caption of the Petition because he reasonably believed that was what this court required." [41]

After concluding that the petitioners were mistaken, the Superior Court considered whether CCS knew or should have known of the mistake. The court concluded that CCS knew or should have known of the mistaken because "Mr. Goddess' email to Ms. Stabler attaching the Petition and Ms. Stabler's rejection of Sheriff's service upon CCS as directed in the praecipe demonstrates that Ms. Stabler, on behalf of CCS, appreciated that the failure to

**40.** *Id.* at 28.

**41.** *Id.* at 38.

include [CCS] in the petition for the writ of *certiorari* was an error and not a deliberate strategy."[42] The court found that CCS should have known of the mistake because Stabler saw that CCS was omitted from the caption of the copy of the petition emailed to her from Goddess.

In conclusion, the Superior Court found "that the addition of CCS through an amendment to the Petition, after the time for appeal has expired, is permissible because the conditions of Rules 15(a) and 15(c) are satisfied." Accordingly, the Superior Court held that CCS could properly be joined and "the court need not address whether CCS is a necessary party under Rule 19(b)."[43] The court denied the respondents' motion to dismiss and granted the petitioners' motion to amend the caption of the petition to add CCS and PDI as parties.

### Superior Court Reverses ZBA Decision

The parties were given the opportunity to brief the merits of the petitioners' appeal of the ZBA decision and on July 21, 2008, the Superior Court issued a memorandum opinion in which it reversed the decision of the ZBA to grant the variance.[44] The Superior Court acknowledged that "PDI made extraordinary efforts in its fight to preserve Gibraltar" but concluded that "the ZBA improperly granted a use variance based on a finding of hardship that was of the applicant's own making." The Superior Court reasoned that in Delaware there is a *per se* bar against granting a variance when the hardship is self-imposed. Therefore, it determined

that the decision of the ZBA must be reversed.

### *No* Per Se *Bar Self–Imposed Hardships*

The appellants contend that the Superior Court committed reversible error when it reversed the decision of the ZBA granting CCS the use variance based on the *per se* bar against self-imposed hardships. The appellants assert that CCS did not create the hardship and that the ZBA properly addressed each element of the unnecessary hardship test. The appellants argue that the Superior Court's adoption of the *per se* bar to variance relief "ignores the public policy underlying the regulatory scheme; ignores the public policy favoring the productive use of land; and ignores the consequences a *per se* bar would have on the implementation of future conservation easements." We have held that in Delaware there is no *per se* bar against a variance for a self-imposed hardship.[45] Accordingly, the Superior Court erred when it reversed the decision of the ZBA based on the *per se* bar against self-imposed hardships.

Gibraltar is zoned R–1 residential. In 1997, when the Sharp family conveyed Gibraltar to PDI, the family also granted a conservation easement on the property to the State of Delaware in exchange for a $1 million grant from Delaware's Open Space Council. The easement limits new construction on the property to structures of 4,000 square feet or less, on the north side of the existing buildings only, with the exact location and specific exterior design subject to express written approval of the state. The easement also protects the

---

42. *Id.* at 38–39.

43. *Id.* at 39.

44. *Brown v. City of Wilmington Zoning Bd. of Adjustment*, C.A. No. 06A–10–005, 2008 WL 2943390 (Del.Super.Ct. July 21, 2008).

45. *Searles v. Darling*, 83 A.2d 96, 100 (Del. 1951).

mansion house and the gardens from development or alteration, and provides that most maintenance and construction on the property is subject to state approval. In addition, all new construction or rehabilitation must conform to the U.S. Department of the Interior's standards for historic properties.

In 1997, when PDI entered a contract with Someplace That's Different, Inc. to develop a bed and breakfast and restaurant on the property—a project that included constructing a 14-room building near the mansion house—the ZBA unanimously approved a use variance to permit the project to go forward. Someplace That's Different, Inc. was unable to obtain financing and abandoned the project.

In 2004, PDI sought new adaptive reuse proposals. PDI received several proposals and selected CCS's proposal to develop Gibraltar for office space. In May 2006, CCS applied to the ZBA for a zoning use variance to adapt the residence at Gibraltar for offices and to construct a new 10,000–square–foot office building with additional parking on the grounds. Following a hearing before the ZBA in August 2006, the ZBA approved the use variance by a vote of 2 to 1. In a written decision issued on August 9, 2006, the ZBA stated that:

> The board having held a public hearing and having heard all the testimony and considering the location, is of the majority opinion that the application could be granted without substantially impairing the general purpose and intent of the Building Zone Ordinance and that it would not adversely affect the character of the neighborhood and there being circumstances of hardship or exceptional practical difficulty ... it was ordered that the application be granted and the decision of the Zoning Administrator be reversed.

The ZBA listed the following factors in support of the board's finding of "circumstances of hardship or exceptional practical difficulty":

1) Given the renovation costs, the existing building cannot reasonably be used in a manner permitted by the current zoning, and;

2) the buildings existing on the premises are in a seriously deteriorating condition and the approval of the variance would allow for their restoration, and;

3) the buildings on the premises have significant historic value and have been, and would continue to be, an asset to the neighborhood and the city in general, and;

4) considering that there are development restrictions limiting the use of the property that, while self-imposed, were specifically instated to prevent the destruction of the buildings and grounds, to prevent large scale redevelopment of the site, and to promise the restoration of the historic structures and gardens, and;

5) considering that it had been understood, at the time of the imposition of the restrictions, that some alternative use would be required to sustain and fund the restoration, and;

6) considering that the Board had previously approved such an alternative use (for a hotel/restaurant/bed and breakfast) and that the current proposal is reasonably similar in scope, and;

7) considering that the property owner has considered a number of potential alternative uses, over a period of years; and

8) considering that the proposed new structures have been designed to limit their visibility to the surrounding area and to be compatible with the residential structures in the area, and;

9) considering that amply parking is to be provided to accommodate the use and that entrances and exits have been designed to funnel traffic to arterial streets and to minimize traffic impact on the residential neighborhood streets, and;

10) considering that there are other commercial and office uses in the area, such that the proposed use would not be entirely inconsistent with the character of the neighborhood.

In their petition for a writ of *certiorari,* the petitioners-appellees argued that the decision of the ZBA should be reversed because: "(1) any hardship established by the Petitioners was self-created and, therefore, a use variance cannot be granted to alleviate the hardship; (2) the deterioration of Gibraltar should not have been considered in support of the decision to grant the variance; (3) CCS did not present substantial evidence to establish hardship; and (4) the CCS project allowed by the variance would alter the essential character of the surrounding neighborhood." [46]

In its *de novo* review of the ZBA's grant of the zoning variance, the Superior Court noted that property owners in Delaware may obtain relief from zoning restrictions by seeking an area or use variance from the regulatory authority.[47] In this case, CCS sought a use variance. The Superior Court noted that a use variance permits a property owner to use his property in a way that is otherwise proscribed by the zoning restriction, e.g., commercial use in a residential district.[48] CCS sought to develop an office complex in an area zoned residential.

Because a use variance "changes the character of the zoned district by permitting an otherwise prohibited use," the Superior Court explained that the applicant must meet the "unnecessary hardship" test,[49] by establishing that:

(1) the land cannot yield a reasonable return if used only for the permitted use;

(2) the need for the variance is due to unique circumstances and not general conditions in the neighborhood which reflect unreasonableness of the zoning ordinance itself;

(3) the use sought will not alter the essential character of the locality; and

(4) all uses permitted on the land under existing zoning are economically unfeasible.[50]

**46.** *Brown v. City of Wilmington Zoning Bd. of Adjustment,* C.A. No. 06A–10–005, at 10 (Del.Super.Ct. Mar. 17, 2008) (mem.).

**47.** *Brown v. City of Wilmington Zoning Bd. of Adjustment,* C.A. No. 06A–10–005, at 12 (Del.Super.Ct. Mar. 17, 2008) (mem.) (citing *Bd. of Adjustment of New Castle County v. Kwik–Check Realty, Inc.,* 389 A.2d 1289, 1291 (Del.1978)).

**48.** *Id.* (citing *Kwik–Check Realty, Inc. v. Bd. of Adjustment of New Castle County,* 369 A.2d 694, 698 (Del.Super.Ct.1977), *aff'd,* 389 A.2d 1289 (Del.1978)). In contrast, the court noted that an area variance allows a property owner to use his property in a way that conforms with the zoning restrictions but is contrary to a specific building restriction, such as a setback or height limitation. The variance amends the building restriction and incorporates the more accommodating restrictions agreed to by the zoning board. To obtain an area variance, the applicant must show that the property or a structure on the property cannot practically be used for a permitted use without conflicting with certain restrictions of the ordinance, under the "exceptional practical difficulties" test. *See id.*

**49.** *Id.* (citing *Bd. of Adjustment of New Castle County v. Kwik–Check Realty, Inc.,* 389 A.2d at 1291).

**50.** *Id.* at 12–13 (citing *Baker v. Connell,* 488 A.2d 1303, 1307 (Del.1985)).

In considering whether or not the applicants CCS and PDI had established that the elements of the "unnecessary hardship" test had been met, the Superior Court noted that "PDI presented a case of hardship to the ZBA predicated upon the basic proposition that the Easement on Gibraltar rendered any use permitted under the R–1 zoning economically impracticable."[51] The court explained that "the predicament confronting the ZBA when CCS presented its application for a use variance" was that "[r]esidential development on the property was not possible because the Easement placed building restrictions on the property that would allow only two lots to be developed" and "[t]he proceeds from such a project would fall woefully short of what is needed to rehabilitate Gibraltar in the manner required by the Easement."[52]

The Superior Court concluded, however, that a landowner in Delaware may not obtain a use variance when the hardship is self-imposed.[53] A hardship is self-imposed if it is the result of a voluntary, affirmative act of the landowner.[54] The court noted that the Superior Court has distinguished between use and area variances when the hardship is self-imposed and has found that "a self-imposed hardship defeats any right to a use variance," but "there is no such *per se* rule for area variances."[55] The Superior Court further explained that

"[w]hile no Delaware court has expressly characterized this prohibition as a *per se* rule, ... the absolute nature of the 'self-imposed hardship' doctrine flows in logical sequence from other well-settled, unequivocal pronouncements of Delaware land use law."[56]

The Superior Court explained that a use variance cannot be granted unless the applicant can meet the "unnecessary hardship" test and that a reviewing court must reverse a zoning authority's grant of a use variance if it is the product of any standard other than the "unnecessary hardship" test or if any element of the test has not been satisfied.[57] The Superior Court concluded that "[w]hen the landowner himself creates the hardship upon which his application for a use variance is based, he cannot, as a practical matter, and as a matter of law, in any instance, satisfy all of the essential elements of the 'unnecessary hardship' test."[58] As an example, the court looked to *Jenney v. Durham,* in which the Superior Court found that the landowner could not establish the first and second elements of the "unnecessary hardship" test because the landowner had "created a situation where he [needed] a variance to build" after agreeing to grant a conservation easement on a portion of his land.[59] Therefore, the Superior Court concluded in this case that "[b]ecause a self-imposed hardship cannot be utilized to sat-

51. *Id.* at 13.

52. *Id.* at 13–14.

53. *Id.* at 14 (citing *Baker v. Connell,* 488 A.2d at 1307).

54. *Id.* (citing *Dexter v. New Castle Bd. of Adjustment,* 1996 WL 658861, at *6 (Del.Super.Ct. Sept. 17, 1996)).

55. *Id.* (quoting *Haley v. Potter,* 1995 WL 790980, at *4 (Del.Super.Ct. Nov.30, 1995), *rev'd on other grounds,* 683 A.2d 59 (Del. 1996)).

56. *Id.* at 14–15.

57. *Id.* at 15 (citing *Jenney v. Durham,* 707 A.2d 752, 757 (Del.Super.Ct.1997), *aff'd,* 696 A.2d 396 (Del.1997)).

58. *Id.* (citing *Jenney v. Durham,* 707 A.2d at 758).

59. *Id.* (quoting *Jenney v. Durham,* 707 A.2d at 758).

isfy any element of the 'unnecessary hardship' test, and because each element of the test must be satisfied to secure a use variance, the presence of a self-imposed hardship, as a matter of law, will preclude the applicant from prevailing on an application for a use variance."[60]

The Superior Court also explained that the rationale for the *per se* rule comes from the purpose of the regulatory scheme giving rise to zoning ordinances and the purpose of the remedy at issue in the case—zoning variances. The court explained that zoning ordinances exist for the general welfare and that the state may, subject to constitutional safeguards, exercise its police powers to limit the rights of citizens to use their property in a way that "make[s] the locality a better place in which to live," protects the value of the property and provides for the health and safety of the people who live in the locality.[61] The Superior Court noted that "it was never intended that individuals should be granted the right to interfere with the State in the adoption of such measures as are reasonably necessary for the general protection of society and to preserve the peace, good order, safety, health and morals of the members of society."[62]

When strict application of a zoning ordinance would result in an unnecessary burden on the landowner, however, the grant of a variance serves as an "escape valve."[63] A variance protects the landowner's rights from the unconstitutional application of zoning laws.[64] Therefore, the court explained, a board of adjustment should grant a variance from a zoning restriction if "strict application would amount to an unconstitutional taking."[65] The court explained that a variance "is intended to strike a balance" between preserving the public's interest in regulating land use and protecting the landowner's interest in exercising his property rights "free from unconstitutional deprivations by the government."[66]

Therefore, the Superior Court explained, a zoning board, in performing its regulatory function, must keep in mind that its main consideration is the public interest[67] and that if the prohibited use is permitted, the land will be used in a manner that is inconsistent with the basic character of the zone.[68] Further, a landowner who applies for a variance seeks permission to violate a regulation enacted by the government for the public good. The Superior Court concluded that it would frustrate the purpose of zoning ordinances and zoning variances to grant a use variance to a landowner who created the hardship[69] because "[a] vari-

**60.** *Id.*

**61.** *Id.* at 16–17 (citing *In re Auditorium*, 84 A.2d 598, 602–03 (Del.Super.Ct.1951)).

**62.** *Id.* at 17 (citing *In re Auditorium*, 84 A.2d at 602–03).

**63.** *Id.* (citing *Miller & Son Paving, Inc. v. Wrightstown Tp.*, 499 Pa. 80, 451 A.2d 1002, 1007 n. 7 (1982)).

**64.** *Id.* (citing 83 Am.Jur.2d *Zoning and Planning* § 750 (2003)).

**65.** *Id.* (quoting 101A C.J.S. *Zoning and Planning* § 301 (2005)).

**66.** *Id.* (quoting 101A C.J.S. *Zoning and Planning* § 301 (2005); *Greenawalt v. Zoning Bd. of Adjustment*, 345 N.W.2d 537, 541 (Iowa 1984)).

**67.** *Id.* at 18 (citing *Baker v. Connell*, 488 A.2d at 1307).

**68.** *Id.*

**69.** *Id.* (citing *Town of Atherton v. Templeton*, 198 Cal.App.2d 146, 17 Cal.Rptr. 680, 684–85 (1961)).

ance is a remedy designed to provide relief from an unnecessary hardship that arises from the government-imposed ordinance or regulation, as opposed to an outside influence or internally created conflict." [70]

Finally, the Superior Court stated "[w]hile the court recognizes the potentially harsh results that may result from enforcement of a *per se* rule, the prospect that an owner might purposefully manipulate zoning restrictions by affirmatively creating a circumstance that causes perceptibly untenable hardship in the use of his property within a zoning designation cannot be countenanced." Because PDI knew when it acquired Gibraltar that its ownership would be subject to the easement's restrictions and because "[t]his was the state of [PDI's] ownership from the time it acquired the property through the time it sought to partner with CCS to building offices on Gibraltar in contravention of the prevailing zoning restrictions," the court found that the hardship was self-imposed and not the product of any unique circumstances or general conditions in the neighborhood. The court stated: "The fact that PDI could not build enough residential units, consistent with R–1 zoning, to yield an adequate return to preserve Gibraltar is a direct, proximate result of the restrictions imposed by the Easement." Therefore, the court concluded "as a matter of law" that the ZBA should not have considered the hardship created by the easement in its unnecessary hardship analysis. The court determined that "the ZBA committed legal error by finding unnecessary hardship and granting a use variance based on a hardship that was self-imposed." [71]

The court acknowledged that PDI had made "extraordinary efforts" in its fight to preserve Gibraltar but stated that PDI was "fighting with one hand tied behind its back" because of the easement and the R–1 zoning, which left PDI with few options for Gibraltar. In a footnote, the court explained:

> Indeed, if not for the fact that the hardship was self-imposed, the Court would have no hesitation in concluding that the applicants satisfied the "unnecessary hardship" test. Gibraltar is in decay and needs to be saved. After an exhaustive search, CCS and PDI had offered a solution that, while at odds with the R–1 zoning, would result in a use of the property that will salvage the existing structures in manner that would not materially alter the character of the surrounding community. In this regard, but for the legal error herein identified, the Court is satisfied that the ZBA decision is supported by substantial evidence. [72]

The court stated, however, that PDI's good faith efforts to find an appropriate reuse that would preserve the deteriorating property were not "factors that overcome the dispositive fact that the restriction on PDI's ability to make full use of the property within the R–1 zoning designation is a circumstance of its own making." The Superior Court reversed the decision of the ZBA granting a use variance to CCS to construct an office complex on Gibraltar, concluding: "This unfortunate circumstance cannot be remedied by a use variance."

 This Court applies the same standard that the Superior Court applied

---

**70.** *Id.* at 18–19 (citing 83 Am. Jr.2d *Zoning and Planning* § 799 (2003); Wilm. C. § 48–70(b)).

**71.** *Id.* at 21.

**72.** *Id.* at 21 n. 63.

to review the decision of the ZBA.[73] If there is substantial evidence in the record on which the ZBA could properly have based its decision, the decision of the ZBA must be affirmed.[74] This Court will not reweigh the evidence or substitute its own judgment for the judgment of the ZBA.[75] This Court will, however, review the Superior Court's legal determinations *de novo.*[76]

The appellants contend that the Superior Court committed both factual and legal error when it found that "[t]he hardship that allowed CCS to claim it had satisfied the first, second and fourth elements of the unnecessary hardship test was self-imposed." First, the appellants argue that CCS did not create the conservation easement or have any involvement in easement's creation. They maintain that the easement was created by the Sharp family and granted to the State in 1997, long before CCS became involved in the Gibraltar project. Therefore, the Superior Court erred as a matter of fact when it stated that the hardship was "self-created." Second, the appellants assert that this Court has held, as early as 1951, that Delaware does not have a *per se* bar against the granting of a variance to a party who purchases property with knowledge of an existing zoning restriction. Therefore, they argue that the Superior Court erred as a matter of law when it held that there is an absolute or *per se* bar against the granting of a variance when the hardship is self-created.

First, we recognize that the appellants correctly assert that CCS did not create the conservation easement. The Sharp family granted the easement to the State in 1997 in a three-part transaction in which PDI acquired the property from the Sharp family for nominal consideration, the Sharp family granted a conservation easement to the State of Delaware and the State paid the Sharp family $1 million. CCS did not exist as an entity until 2002 and did not become involved in the Gibraltar project until 2004, long after the Sharp family conveyed Gibraltar to PDI and granted the conservation easement to the State.[77]

■ Second, the appellants correctly argued that this Court has held that Delaware does not have a *per se* rule against granting a variance if the applicant purchases the property with knowledge of an existing zoning restriction. In *Searles v. Darling,* the landowner purchased the property with "the hope and expectation that a [use] variance would be granted."[78] The landowner sought a use variance so that he could demolish some residential properties on the land and construct a multi-vehicle garage in their place to use in conjunction with an apartment building on an adjacent piece of property.[79] The zoning was in place when the landowner purchased the property for which he sought the use variance.[80] In 1951, this Court specifically considered in *Searles* whether to impose an absolute bar against

---

**73.** *Sawers v. Bd. of Adjustment,* 1988 WL 117514, at *2 (Del.Supr. Oct. 26, 1988).

**74.** *Id.* (citing *Searles v. Darling,* 83 A.2d 96 (Del.1951)).

**75.** *Janaman v. New Castle County Bd. of Adjustment,* 364 A.2d 1241, 1242 (Del.Super.Ct.1976), *aff'd,* 379 A.2d 1118 (Del.1977).

**76.** *Sawers v. Bd. of Adjustment,* 1988 WL 117514, at *2.

**77.** This Court may take judicial notice of the date that CCS was formed. D.R.E. 201(b).

**78.** *Searles v. Darling,* 83 A.2d 96, 100 (Del. 1951).

**79.** *Id.* at 97–98.

**80.** *Id.* at 100.

granting a variance to parties in the land-owner's position and declined, stating:

> The circumstance that Darling bought this lot after it had been zoned for residential purposes is itself almost, if not quite, sufficient to preclude the possibility of his being granted a variance. Normally such a variance is not available to a person in such circumstances. . . . But some cases take the more liberal view that . . . the fact that a person bought his property after the zoning restrictions were placed upon it does not altogether foreclose such an application. . . . We entertain this latter and more liberal view.[81]

More recently, the Superior Court has recognized that "Delaware does not have a *per se* rule prohibiting a variance to the purchaser of property."[82] In *Liarakos v. New Castle County Board of Adjustment,* the New Castle County Board of Adjustment granted two variances to the landowner. The Superior Court affirmed the decision of the Board of Adjustment even though the landowner "came to the restricted subject property with a particular unpermitted use in mind and mindful of the impossible area restrictions for that use."[83] The court explained that the applicant's awareness of the conservation easement is relevant but not dispositive.[84] Instead, that knowledge is a factor for the zoning authority to consider when deciding whether or not to grant the variance.

The Superior Court relied on *Baker v. Connell* for the proposition that Delaware has a *per se* rule against a variance when the hardship is self-imposed. In *Baker,* this Court held that a property owner's knowledge of an existing zoning restriction is not dispositive to the decision to grant or deny a variance.[85] Accordingly, we reaffirm our holding that an applicant's awareness of an existing zoning restriction or conservation easement does not preclude a variance *per se.* Instead, a self-imposed hardship is a factor for the regulatory authority to consider when deciding whether or not to grant the variance. As such, there is no *per se* prohibition against a variance when a hardship is self-imposed.

### In Appeal of ZBA Decision Landowner is Necessary Party

Although our analysis could end at this point, we nonetheless address the second argument of the appellants/respondents-below, that the Superior Court committed reversible error when it denied the ZBA's motion to dismiss for failure to join PDI as an indispensable party. We address this issue to clarify the procedural requirements for perfecting an appeal to the Superior Court in cases of this kind.

The Superior Court concluded that the landowner was not a necessary party to the appeal, and to the extent that the landowner had an interest in the appeal, CCS could represent its interests. Specifically, the Superior Court determined that PDI was not a necessary party because "it was not a party to the ZBA proceeding." The Superior Court reasoned that the variance application listed only CCS as the applicant, and that PDI did not participate in the ZBA hearing and was not mentioned in the ZBA's written decision. The Supe-

---

81. *Id.* (citations omitted).

82. *Liarakos v. New Castle County Bd. of Adjustment,* 1998 WL 437135, at *1 (Del.Super.Ct. July 23, 1998) (citing *Searles v. Darling,* 83 A.2d at 100).

83. *Id.,* at *2.

84. *Id.,* at *1–2.

85. *Baker v. Connell,* 488 A.2d 1303, 1308 (Del. 1985).

rior Court concluded: "To the extent PDI has an interest in these proceedings, it would be well-represented by CCS."

The appellants assert that: the "failure to join an indispensable party to an appeal is fatal to the jurisdiction of the court;"[86] "'[c]learly, a property owner whose interests are impacted by a ruling is an affected party' and therefore indispensable;"[87] and as the owner of Gibraltar, "PDI is an indispensable party, not timely named in the appeal to the Superior Court."

The appellees/petitioners-below argue that PDI "was not intended as a party on appeal" and that CCS was the only unnamed but intended party. The appellees claim that they were appealing from an administrative decision that referred only to the applicant, CCS, and did not mention PDI. They further contend that even if PDI had an interest in the administrative proceedings, the Superior Court correctly concluded that PDI was not a necessary party because "to the extent PDI has an interest in these proceedings, it would be well-represented by CCS." They assert that PDI was "content throughout to have the fight carried by the developer-proponent" and that "PDI has no unique arguments to make that were not presented by CCS."

 This Court reviews the Superior Court's denial of a motion to dismiss *de novo*.[88] We conclude that the Superior Court erred when it determined that PDI is not a necessary party. As we held in *Hackett v. Board of Adjustment of Rehoboth Beach* and now reaffirm, the owner of land that is the subject of a decision of a municipal board of adjustment is a necessary party that must be joined in an appeal of that decision.[89]

It is well-settled that "all parties to the litigation, who would be directly affected by a ruling on the merits of an appeal, should be made party to the appellate proceedings."[90] This policy is reflected by Superior Court Civil Rule 19(a), which relevantly provides:

> A person ... shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest.[91]

In *Hackett*, the petitioners filed a petition for a writ of *certiorari* in the Superior Court pursuant to section 328, challenging the decision of the Rehoboth Beach Board of Adjustment to issue a building permit to the Sands Hotel.[92] The petitioners named only the Board of Adjustment in the caption of their appeal and in the praecipe. They did not name the Sands in the cap-

**86.** The appellants cite *Hackett v. Bd. of Adjustment of Rehoboth Beach,* 794 A.2d 596, 599 (Del.2002); *Sussex Medical Investors, L.P. v. Delaware Health Res. Bd.,* 1997 WL 524065, at *2 (Del.Super.Ct. Apr. 8, 1997).

**87.** The appellants quote *Hackett v. Bd. of Adjustment of Rehoboth Beach,* 794 A.2d at 598; *Preston v. Bd. of Adjustment,* 772 A.2d 787, 789 (Del.2001).

**88.** *Preston v. Bd. of Adjustment,* 772 A.2d 787, 789 (Del.2001).

**89.** *Hackett v. Bd. of Adjustment of Rehoboth Beach,* 794 A.2d 596 (Del.2002).

**90.** *State Personnel Comm'n v. Howard,* 420 A.2d 135, 137 (Del.1980); *see Preston v. Bd. of Adjustment,* 772 A.2d 787, 789–90 (Del.2001) (citing Del. Super Ct. Civ. R. 19(a)).

**91.** Del. Super Ct. Civ. R. 19(a); *Preston v. Bd. of Adjustment,* 772 A.2d at 790.

**92.** *Hackett v. Bd. of Adjustment of Rehoboth Beach,* 794 A.2d 596, 597 (Del.2002).

tion and did not list the Sands as a party in the body of the petition.[93] The petitioners mailed copies of the appeal to several parties, including the attorney who represented the Sands at the hearing before the Board of Adjustment.[94] The attorney received the copy of the appeal within the thirty-day appeal period but did not tell the Sands about the appeal until after the thirty-day period had expired.[95]

In *Hackett,* the Superior Court concluded that it was inappropriate to permit the petitioners to correct the caption, because the petitioners had given no indication that they intended the Sands to be a party to the appeal.[96] The petitioners had not directed the Prothonotary to send notice to the Sands as required by Superior Court Civil Rule 72(c) and the Sands was not asked to participate in any proceedings related to the appeal.[97]

We affirmed the Superior Court's dismissal of the appeal because the *certiorari* petitioners failed to name the landowner— an indispensable party to an appeal from a decision of the board of adjustment.[98] In *Hackett,* we held that "[a] property owner whose interests are impacted by a ruling of a board of adjustment is an affected party." We also held that a petitioner for a *certiorari* appeal must comply with certain pleading requirements, such as "notice to a party affected by the administrative ruling, either directly or through a desig-

nated agent." [99] Accordingly, the landowner is an indispensable party to an appeal from a decision of the board of adjustment that affects the landowner's property.[100]

■ In this case, the petitioners-below failed to name PDI—the owner of Gibraltar—as a party to the appeal. They now assert that they did not intend to name PDI as a party. We conclude that the Superior Court erred when it determined that PDI is not a necessary party to the appeal. As the landowner, PDI's interests are directly affected by the appeal of the ZBA's decision. Contrary to the Superior Court's finding, PDI was a party to the ZBA proceeding. The variance application has separate fields for the variance applicant and the property owner. The application lists PDI as the property owner.

In addition, PDI participated in the hearing before the ZBA by providing extensive testimony. PDI Board Member and Chair of the Gibraltar Redevelopment Committee Rebecca Sheppard testified on behalf of PDI about the history of Gibraltar, PDI's acquisition of the property, Gibraltar's current condition, PDI's efforts to find an adaptive reuse for the property, and the hardships PDI would suffer without the use variance. The ZBA's written decision refers to PDI as the "property owner" multiple times, emphasizes the hardships that Sheppard testified about,

93. *Id.*

94. *Id.*

95. *Hackett v. Bd. of Adjustment of Rehoboth Beach,* C.A. No. 001–11–001 (Del.Super.Ct. May 11, 2001).

96. *Hackett v. Bd. of Adjustment of Rehoboth Beach,* C.A. No. 001–11–001 (Del.Super.Ct. May 11, 2001).

97. *Hackett v. Bd. of Adjustment of Rehoboth Beach,* C.A. No. 001–11–001 (Del.Super.Ct. May 11, 2001).

98. *Hackett v. Bd. of Adjustment of Rehoboth Beach,* 794 A.2d 596, 597 (Del.2002).

99. *Hackett v. Bd. of Adjustment of Rehoboth Beach,* 794 A.2d at 598.

100. *Hackett v. Bd. of Adjustment of Rehoboth Beach,* 794 A.2d at 598–99 (stating that "the failure to name an indispensable party to an appeal from an administrative agency to the Superior Court is not an amendable defect" under Rules 15 and 19).

and bases seven of the ten reasons for granting the variance on testimony from Sheppard and facts unique to Gibraltar. Accordingly, PDI is a necessary party.

In this case, PDI did not receive notice of the appeal. Goddess did not send a note with the petition attached to PDI. The praecipe did not name PDI. In fact, the Superior Court did not find that PDI received notice. Instead, it found that CCS received notice and CCS could represent PDI's interests in the appeal. We conclude, however, that the Superior Court erred when it determined that PDI's interests would be well-represented by CCS.

■ When the property owner and the variance applicant are distinct entities, their interests cannot be presumed to be aligned. In *Southern New Castle County Alliance v. New Castle County*, the Court of Chancery recognized that the record owner of properties affected by a record plan approval and the equitable owners/potential developers do not necessarily have the same interests.[101] The court explained that "[a] challenge to the approval of the record plan may affect the developers (the equitable owners) and the record owners of property in different ways, depending upon their respective interests in the development. Those interests are typically defined by contract, and will vary from case to case."[102]

In *Southern New Castle County Alliance*, the Court of Chancery considered whether the record owners of properties affected by the record plan approval were indispensable parties to an action challenging the plan.[103] The action named only the equitable owners of the property (i.e., the "buyers-to-be").[104] The plaintiffs argued that "because the buyers-to-be ... are the equitable owners of the property, their interests are identical to those of the record owners."[105] Therefore, the plaintiffs argued, the record owners were not indispensable parties because their interests would be adequately protected by the equitable owners.[106] The Court of Chancery disagreed, stating that the plaintiffs' argument rested on "an implicit presumption that the interests of the record and equitable owners of .... to-be-developed property will invariably be identical."[107]

The Court of Chancery stated that the plaintiffs' presumption was "factually and legally unsupported."[108] The court explained that "[i]f any presumption is appropriate, it is that the interests of the record owner and the equitable owner of property are not identical," and in that case, the plaintiffs failed to make a specific showing to the contrary.[109] Therefore, the court concluded that the record owners of the property were indispensable parties to the action under Court of Chancery Rule 19.[110]

Similarly, in this case, PDI and CCS have unique interests in upholding the variance. PDI is the current record owner of Gibraltar. CCS, the potential developer, is

101. *Southern New Castle County Alliance, Inc. v. New Castle County Council,* 2001 WL 855434 (Del.Ch. July 20, 2001).

102. *Southern New Castle County Alliance, Inc. v. New Castle County Council,* 2001 WL 855434, at *3.

103. *Id.,* at *2–4.

104. *Id.* at *1.

105. *Id.,* at *2.

106. *Id.*

107. *Id.,* at *3.

108. *Id.*

109. *Id.*

110. *Id.,* at *4.

the equitable owner.[111] PDI's interests in upholding the variance remain even if CCS abandons the project, because PDI will have to find a new developer for Gibraltar. In addition, the Superior Court made a factual finding directly affecting PDI's interests when it stated that PDI created the conservation easement and was therefore precluded from claiming hardship. As the appellants correctly assert, "[t]hat finding led the court to bar PDI (CCS and apparently all subsequent purchasers) from ever obtaining variance relief from the ZBA and plainly impedes PDI's property rights."

Furthermore, as the potential developer and equitable owner, CCS cannot adequately represent PDI's interests. Contrary to the appellees' assertion, PDI's conduct cannot be construed as evidence that CCS and PDI have identical interests. PDI's decision not to participate in the briefing on the motion to dismiss could just as easily be construed as a tactical decision to avoid a finding that they had intervened in the appeal, precluding a claim they were indispensable.[112] PDI's filing in the Superior Court that it "joins and adopts the facts and arguments made by CCS [in its answering brief to the motion to dismiss] . . . as if made by PDI" simply indicates that PDI asserted the same arguments as CCS asserted in its answering brief with regard to the ZBA's motion to dismiss for failure to name PDI or CCS as parties to the appeal. It does not indicate an intent to have CCS "carry the fight" for PDI throughout the administrative proceedings and appeal process.

In conclusion, the Superior Court erred when it determined that PDI was not a necessary party and that its interests in the appeal could be adequately represented by CCS. As the owner of Gibraltar, PDI is an indispensable party to the appeal of the decision of the ZBA affecting Gibraltar. PDI did not receive notice of the appeal. In addition, the appellees/petitioners-below stated that PDI was not an intended party to the appeal, precluding an assertion that PDI was omitted from the appeal by mistake for purposes of the relation-back requirements of Superior Court Civil Rule 15(c).

Although appellees' counsel erred by not naming CCS and PDI as parties to the Superior Court *certiorari* appeal, it is understandable why he was misled into naming only the ZBA. The official Superior Court form (erroneously) prescribes that very approach, and nothing in Superior Court Civil Rule 72 indicates the contrary or provides any useful guidance. The Superior Court should amend its Rule 72 and the counterpart official form to conform with our opinion in this case.

### Conclusion

For the foregoing reasons, the judgment of the Superior Court is reversed and the decision of the ZBA granting the use variance to CCS is reinstated.

---

**111.** Counsel for CCS stated in her letter to DiPinto that CCS "has Gibraltar under contract" and "is the equitable owner of the property."

**112.** *See, e.g., Preston v. Bd. of Adjustment,* 772 A.2d 787 (Del.2001).