BARLEY MILL, LLC, Defendant–Below, Appellant/Cross–Appellee,

v.

SAVE OUR COUNTY, INC., Barbara Furbeck, Lawrence Giordano and Thomas S. Neuberger, Plaintiffs–Below, Appellees/Cross–Appellants,

v.

New Castle County, Defendant–Below, Appellee/Cross–Appellant,

and

The County Council of New Castle County, Defendant–Below, Cross–Appellee.

No. 419, 2013.

Supreme Court of Delaware.

Submitted: March 5, 2014.
Decided: March 25, 2014.

Christian Douglas Wright, Esquire (argued), John E. Tracey, Esquire, William E. Gamgort, Esquire, Lakshmi A. Muthu, Esquire, Young Conaway Stargatt & Taylor, LLP for Appellant/Cross-Appellee, Barley Mill, LLC.

Jeffrey S. Goddess, Esquire (argued), Rosenthal, Monhait & Goddess, P.A. for Appellees/Cross-Appellants, Save Our County, Inc., et al.

Sidney S. Liebesman, Esquire (argued), R. Montgomery Donaldson, Esquire, Lisa Zwally Brown, Esquire, Montgomery, McCracken, Walker & Rhoads, LLP, for Appellee/Cross-Appellant, New Castle County.

Before STRINE, Chief Justice, HOLLAND, BERGER, and RIDGELY, Justices, and VAUGHN, President Judge,* constituting the Court en Banc.

STRINE, Chief Justice:

## I. Introduction

Barley Mill, LLC ("Barley Mill") appeals from a Court of Chancery judgment invalidating a vote of the New Castle County Council (the "Council") on a rezoning ordinance. Approval of the rezoning ordinance was necessary so that Barley Mill could proceed with its plan to transform property that had been used as an office park into a much larger development that included both more office space and a regional shopping mall. The increase in traffic that would be associated with this development was of considerable concern to both the public and members of the Council itself. But the Council was advised that (i) it could not obtain the traffic information and analysis (for ease of reference, the "Traffic Information") that Barley Mill was required to provide to the Delaware Department of Transportation ("DelDOT") under 9 *Del. C.* § 2662 ("§ 2662") as part of the overall rezoning process before the Council exercised its discretionary authority to vote on the rezoning ordinance and (ii) that the Traffic Information was not legally relevant to the Council's analysis. That advice was incorrect and there were no legal barriers that prevented the Council from obtaining the Traffic Information or considering it before casting its discretionary vote on the rezoning ordinance.

After the rezoning ordinance was approved, nearby resident homeowners and

---

* Sitting by designation pursuant to art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 and 4(a) to constitute the quorum as required.

Save Our County, Inc. ("Save Our County") challenged the zoning ordinance in the Court of Chancery arguing that, not only was the Council allowed to consider the Traffic Information, but both § 2662 and the New Castle County Unified Development Code (the "UDC") required it to consider that information before its discretionary vote. They also argued that, even if the Council was not required to consider the Traffic Information before its discretionary vote, the vote on the rezoning ordinance was arbitrary and capricious because the Council had received erroneous legal advice that the Traffic Information was both unavailable and irrelevant at the time the Council cast its discretionary vote on the rezoning ordinance. As a result, the Council voted in the absence of material information that certain Council members had expressed a desire to have before the discretionary vote took place. The Court of Chancery agreed with this claim and held that the mistake of law caused the Council to vote without first obtaining the Traffic Information that was material to its vote, rendering that vote arbitrary and capricious.

On appeal, Barley Mill argues that the Court of Chancery erred when it invalidated the Council's vote. Save Our County and New Castle County cross-appealed, arguing that the Court of Chancery erred in holding that neither § 2662 nor the UDC require the Council to consider a traffic analysis before casting its discretionary vote on the rezoning ordinance. The interplay of § 2662, the UDC, and Barley Mill's rezoning application has given life to a variety of legal questions. But the one that ultimately formed the basis of the Court of Chancery's ruling was whether the Traffic Information was legally available to the Council before it cast its discretionary vote on the rezoning ordinance. That is, regardless of whether the Traffic Information was *required* to be completed and delivered to the Council before it cast its discretionary vote on the rezoning ordinance, was the Council *allowed* to obtain the Traffic Information before that vote?

The Court of Chancery grounded its finding that the Council's vote was arbitrary and capricious on the conclusion that, as a result of incorrect legal advice, Councilman Robert Weiner cast his discretionary vote on the rezoning ordinance without the benefit of the Traffic Information that was material to the Council's consideration of whether to approve the rezoning. The Court of Chancery's determination was supported by the following findings of fact and law: (i) the Council was told, by Barley Mill's attorney and by the manager of the New Castle County Department of Land Use (the "Planning Department"), that the Council could not obtain or consider the Traffic Information before the Council exercised its discretionary vote on the rezoning ordinance; (ii) that advice was incorrect and there were no legal obstacles that prevented the Council from obtaining and considering the Traffic Information; (iii) that mistaken legal advice caused members of the Council to vote without the Traffic Information, which was material and relevant to their decision; and (iv) the mistake of law tainted the final vote because the ordinance passed by only a seven-to-six vote and Councilman Weiner's affirmative vote was necessary to its adoption. Each of those findings was correct, and thus, we affirm.

Because we affirm the Court of Chancery's decision on that basis, we do not reach the claims raised by Save Our County and New Castle County on cross-appeal that the Court of Chancery erred in holding that neither § 2662 nor the UDC require the Council to consider a traffic analysis before voting on a rezoning ordinance. Precisely because we acknowledge the im-

portance of these open legal issues, we affirm the Court of Chancery on the narrow and case-specific grounds discussed below and therefore do not reach those substantial questions, leaving them for the appropriate legislative bodies to consider in the first instance, or for later judicial resolution in a case where answering them is necessary.

## II. Factual And Procedural Background

We base our discussion on the facts as found by the Court of Chancery in its opinion, which were well-supported by the record.[1] In September 2007, Barley Mill purchased Barley Mill Plaza, 92 acres of land at the intersection of State Routes 141 and 48 (the "Property"). The Property has been used as an office park since the 1980s, with the primary occupants being units of the DuPont Company. The Property contains over 1,000,000 square feet of low rise office space and no retail stores. In 2008, Barley Mill submitted an application to the Planning Department to redevelop the Property (the "First Plan"). The First Plan contemplated demolishing all of the existing office buildings and constructing approximately 700,000 square feet of residential space, 675,000 square feet of retail space, and 1,485,000 square feet of office space on the Property. The First Plan would have more than doubled the square footage of the buildings on the Property, and much of that additional space was to be used for retail stores. The First Plan was consistent with the Property's then-existing zoning status as Office Regional and no rezoning would have been required.

Members of the community were strongly opposed to the First Plan because,

among other reasons, it involved transforming a relatively quiet office park into a complex that contained both a regional shopping mall and a more substantial office park, with corresponding effects on traffic and the nature of the surrounding community. In 2010, Barley Mill entered into a negotiated agreement with Citizens for Responsible Growth—one of the organizations representing the community opposition—that addressed some of the community's concerns regarding both the First Plan and other large development projects that were being undertaken in the area. Under the agreement, Barley Mill agreed to submit a revised plan for the Property with reduced development (the "Second Plan") and, in exchange, Citizens for Responsible Growth agreed not to oppose the Second Plan. The Second Plan was submitted to the Planning Department on March 24, 2011. The Second Plan reduced the overall square footage of the development and eliminated the residential component, but it still included a regional shopping mall, sites for free-standing restaurants and other businesses, and an expanded office complex. Because the Second Plan did not include a residential component, it could only proceed if New Castle County rezoned approximately 37 acres of the Property from Office Regional to Commercial Regional.

From the inception of the County's process to consider the rezoning application for the Second Plan, the interplay of New Castle County's Unified Development Code (the "UDC") and § 2662 gave rise to important legal questions. Under the UDC, the rezoning process that governed Barley Mill's application involved three stages. In the first stage, the Exploratory Stage, the Planning Department reviews

---

1. *Save Our County, Inc. v. New Castle County,* 2013 WL 2664187, at *9 (Del.Ch. June 11, 2013).

the rezoning application, familiarizes the applicant with the rezoning process, confers with the applicant, and issues a preliminary report identifying concerns related to the application and listing any other information that the applicant needs to file.[2] During the second stage, the Rezoning/Preliminary Plan Stage, the Planning Department and the Planning Board—a New Castle County administrative body—hold public hearings and make recommendations to the Council and, if the Planning Department recommends approval, the Council introduces a rezoning ordinance, holds a public hearing, and votes on the ordinance.[3] The second stage is a critical one because it is the last stage where the Council has genuine policy discretion to turn down a rezoning based on the factors it may consider, which include the effect a rezoning will have on traffic. After the Council casts its discretionary vote and approves a rezoning ordinance, the plan proceeds to the third stage of the rezoning, the Record Stage. After the plan has entered the Record Stage, the Council's authority is purely ministerial.[4] In other words, even if a traffic analysis indicating that the rezoning would have a detrimental effect on local traffic was created during the Record Stage, the Council would have no authority to stop the plan from going forward as long as DelDOT agreed to sign off on the record plan, the final construction plans conformed to the record plan, and all other required agency approvals were secured.

The Council's consideration of Barley Mill's rezoning application also had to comply with certain statutory requirements, including those found in § 2662, which states in pertinent part that:

> The County Council shall not approve any proposed change in the zoning classification for land ... without first complying with the following procedures:
>
> (1) ... [T]he County Council ... shall establish an agreement with [DelDOT] to provide a procedure for analysis by DelDOT of the effects on traffic of each rezoning application.
>
> . . .
>
> (3) The purpose of the agreement shall be to ensure that traffic analyses are conducted as part of the zoning reclassification process within the County.
>
> (4) The agreement shall provide for the review of traffic impacts ... and shall, at a minimum, consider the effects of existing traffic, projected traffic growth in areas surrounding a proposed zoning reclassification and the projected traffic generated by the proposed site development for which the zoning reclassification is sought.

A close reading of § 2662 reveals that it is not a model of simple, straight-forward drafting. The parties to this case have extensively debated, for example, whether the provision requiring the Council to enter into an agreement under which DelDOT will analyze the traffic effects of each rezoning application requires that analysis to be provided to the Council before it casts its discretionary vote on the rezoning ordinance.[5] But there is no debate that, at

---

2. UDC § 40.31.112 (1997 ed.).

3. UDC § 40.31.113 (1997 ed.).

4. UDC § 40.31.114 (1997 ed.).

5. As we will discuss later, we express no opinion about whether § 2662 requires the Council to receive and consider the Traffic Information before casting its discretionary vote on the rezoning ordinance. The Court of Chancery held that the statute only requires the Council to enter into this agreement and that the statute does not require the Council to obtain and consider that information before its discretionary vote on the rezoning ordinance. *Save Our County, Inc. v. New Castle County*, 2013 WL 2664187, at *5–6 (Del.Ch. June 11, 2013). Because we affirm

the very least, § 2662 requires the Council to enter into an agreement with DelDOT, and the Council entered into such an agreement in 1990 (the "1990 Agreement"). The parties also debate whether § 2662 provides a private right of action and whether, under the UDC, the Second Plan must be the subject of a comprehensive Traffic Information Study ("TIS") or a somewhat less detailed Traffic Operational Analysis ("TOA"), whether the Second Plan qualifies as a "redevelopment plan," and, if it does, what significance that designation has on the procedures for approval of the rezoning ordinance.

Although the parties disagree as to how these important legal issues should be answered, there are at least two things they do not dispute. First, the UDC, § 2662, and the 1990 Agreement indisputably required that at least a TOA be completed and approved by DelDOT before final approval of Barley Mill's Second Plan during the Record Stage. Second, regardless of whether the Council was required to consider the Traffic Information at an earlier stage in the rezoning process, it is undisputed that there were no legal obstacles that prevented the Council from considering the Traffic Information before it cast its discretionary vote on the rezoning ordinance.

But, during the rezoning process, the question of whether the Traffic Information would be made available to the Council before its discretionary vote on the rezoning ordinance intersected with confusion over an amendment to the UDC that modified the rezoning process. The UDC was amended on January 1, 2010 to "improve and simplify" the three-step review process for major plans and rezonings by replacing it with a two-step review process.[6] As the Court of Chancery explained, "the changes consisted primarily of combining the 'Exploratory Sketch Plan' and the 'Rezoning/Preliminary Plan' stages into one phase, the 'Exploratory Plan Review Phase.'"[7] The combination of the first two steps was intended to "improve plan review times by reducing redundant reviews."[8] As the Court of Chancery found, and the parties do not dispute, there is nothing in the amendment to the UDC that limited or altered the Council's ability to obtain or consider the Traffic Information.[9] Under the amended UDC, the Council's discretionary vote takes place at the end of the Exploratory Plan Review Phase and, after the Council has cast its discretionary vote in favor of a rezoning ordinance, the plan proceeds to the Record Stage. The amendment to the UDC made no relevant changes to the Record Stage of the review process and, just as in the

the Court of Chancery's invalidation of the Council's vote on other grounds, we do not reach the question of whether § 2662 requires more of the Council than that it enter into an agreement with DelDOT. For a discussion of this important issue, see *infra* note 39 and accompanying text.

6. *Save Our County, Inc. v. New Castle County*, 2013 WL 2664187, at *9 (Del.Ch. June 11, 2013) (citing New Castle County Ordinance No. 09–066).

7. *Save Our County, Inc. v. New Castle County*, 2013 WL 2664187, at *9 (Del.Ch. June 11, 2013).

8. New Castle County Ordinance No. 09–066, *available at* http://www3.nccde.org/PDFDocument/file/48f3368b–f45d–4e50–91aa–8864750a93dd.pdf.

9. *Save Our County, Inc. v. New Castle County*, 2013 WL 2664187, at *9 (Del.Ch. June 11, 2013) ("The amendments do not require traffic information to be considered *only* after a rezoning vote of the County Council.... There is simply no support for the Developer's contention—made to the Council but *not* in this action—that such consideration was prohibited.") (emphasis in original).

Record Stage of the three-step review process, the Council only has ministerial authority at that stage.

The record reveals that, as Barley Mill's rezoning application was being considered, a major concern—expressed by members of the community and by the Council itself—was whether the development would result in increased traffic that would be detrimental to the community. For many in the community, even the brightened prospect of being in closer proximity to a Cheesecake Factory and Cinnabon did not assuage their worries about the effect that the large scale development and its accompanying traffic would have on their quality of life. Members of the Council expressed a desire for the Traffic Information, but Barley Mill's attorney told them that the move from a three-step to a two-step review process pushed the consideration of traffic issues to the Record Stage of the review process, meaning that the Council's discretionary authority to approve the rezoning would have been exercised before the Traffic Information was completed and available to the Council. Barley Mill now acknowledges that the Second Plan was actually proceeding under the three-step review process and that, even if the amendment to the UDC had altered the Council's ability to consider traffic, it would not have been applicable to this rezoning decision.[10]

Despite that reality, the amendment to the UDC took on an important role in the deliberative process regarding the rezoning application. From the beginning, the Council and members of the public had major concerns about the effect the Second Plan would have on traffic. For ex-ample, at the public hearing held by the Planning Department and the Planning Board on June 7, 2011, many of those in attendance expressed concern that the Second Plan would result in increased traffic on State Routes 141 and 48 and the Tyler McConnell Bridge, which were already very busy during commuting hours. Councilman Weiner also attended that meeting. It appears from Councilman Weiner's statements that, earlier in the process, Barley Mill's attorney incorrectly suggested that the Second Plan was proceeding under the two-step review process and that Traffic Information was not available to the Council before it cast its discretionary vote on the rezoning ordinance. At the June 7, 2011 hearing, Councilman Weiner stated:

> I believe that Council's adoption of a UDC text amendment ... which apparently incorporated what I now believe to be the unintended consequence of removing traffic information from the public and the County's scrutiny is a decision which now should be reversed. *It was not until the Barley Mill Plaza Planning Board hearing in this room in January 2010 when [Barley Mill's] then attorney announced at the public hearing that the community had no legal right to consider traffic information that I then realized what a mistake it was to have adopted that law.*[11]

Barley Mill's attorney responded to Councilman Weiner's statements but made no attempt to correct the impression that there was no legal right for the Council to consider the Traffic Information and instead reinforced this belief by stating that

10. *See, e.g.*, Barley Mill's Op. Br. at 6 ("In late 2009, Council adopted Ordinance No. 09–066 to collapse the County's development process from three steps to two steps. UDC amendments do not apply to applications already on file, 9 Del. C. § 2659(c), and Barley Mill's application to redevelop the Property was filed on March 26, 2008.").

11. Appendix to Barley Mill's Op. Br. at A0210 (emphasis added).

"[t]he current process does not require traffic to be resolved at this point in time." [12] No one else at the hearing corrected that misunderstanding.

After the public hearing, the Planning Board recommended against the rezoning, but the Planning Department recommended that the rezoning be approved and the rezoning ordinance was submitted to the Council. The rezoning ordinance was first considered at the Council's Land Use Committee meeting on October 4, 2011. Barley Mill's attorney presented the Second Plan for the Council's consideration and made the following statement concerning traffic:

> The property is surrounded on three sides by transportation routes without any neighboring properties directly abutting this property. *Other traffic is not relevant for this part of the analysis given the Council's conscious decision to adopt the two-step process as opposed to the three-step process which pushes the traffic component to the end.*[13]

A short time later in the hearing, when asked about the Planning Board's recommendation against the rezoning, Barley Mill's attorney stated: "[t]he Planning Board vote was 5–2 against the recommendation. The members that spoke against it[,] *some of them had traffic concerns[,] which as Council knows is not part of the equation for this type of analysis.*"[14]

The inaccurate contention that the Traffic Information was not relevant to the Council's analysis and could not be considered before the discretionary vote on the rezoning ordinance permeates the record. That inaccurate assertion was never contradicted, and the record supports the Court of Chancery's finding that members of the Council believed that the Traffic Information was legally unavailable and that they were not supposed to consider it at that stage. For example, just before the meeting on October 4, 2011 was opened for public comments, Councilman George Smiley revealed that he was under the mistaken impression that the Council no longer handled traffic when he stated: "I really don't want everyone spinning their wheels with losing 15 minutes or five minutes of their talk time on traffic when this isn't where it needs to be."[15] Nonetheless, many of the public comments did concern traffic.

After the public comments had concluded, members of the Council, who were understandably confused about their ability to obtain or consider the Traffic Information, questioned David Culver, the manager of the Planning Department, about the role of traffic in the Council's discretionary approval process. Councilman Street attempted to clarify his understanding of the law and stated: "In the instant case we are being asked[,] I just want to be sure I'm correct[,] to vote on a rezoning and in blind faith as it relates to DelDOT in what it may say needs to be done with the roads going forward. Am I correct?"[16] Mr. Culver replied with vague statements and further exacerbated the misunderstanding by advising the Council that "roads" were not among the factors that the Council could consider at this stage.[17] Councilman Street expressed his frustration with Mr. Culver's non-responsive answer when he said to Mr. Culver: "[I]t's not your fault[,] but I just have a

12. *Id.* at A0213.

13. *Id.* at A0272 (emphasis added).

14. *Id.* at A0279 (emphasis added).

15. *Id.* at A0298–99.

16. *Id.* at A0333.

17. *Id.* at A0333–34.

problem in this case ... because to me it is blind faith. You are depending on the state ... and you depend on DelDOT in good faith and to do the right thing ... in terms of the roads after we voted *and we don't have any information prior to it.*" [18] No one made any attempt to correct the inaccurate belief that the Council could not obtain or consider the Traffic Information before its discretionary vote on the rezoning.

Councilman Weiner followed up on Councilman Street's line of questioning when he observed that when the Council "shifted from a three-step approval to a two-step approval process ... [it] lost an opportunity to have an understanding of traffic improvements which could be committed to be made at the time that the rezoning was being granted" and asked Mr. Culver whether his understanding of the changes was correct.[19] Still, Mr. Culver did nothing to correct the inaccurate belief expressed by both Councilman Street and Councilman Weiner that the Traffic Information was unavailable to them and no member of the legal staff spoke up to resolve the confusion.

The Council held another hearing on October 11, 2011 and traffic was, once again, a focus of the public comments. The final Council meeting related to the rezoning application was held on October 25, 2011, and the Council voted on the rezoning at the conclusion of that meeting. After the floor was closed to public comments and just before the final vote was called, Councilman Weiner again expressed his displeasure with the legal advice that the Traffic Information was not available when he stated:

I just want to echo the sentiment expressed by many of the speakers about the lack of traffic data. *It's a shame that [as an] inadvertent by product of moving from the three-step to the two-step approval process we lost the traffic data* and commitment to needed traffic improvements at the time we exercise our discretionary rezoning authority. That's at the time of the rezoning vote. When it comes back to us for a record plan approval we'll only have administerial authority which means we can only vote yes once we are convinced that there's been compliance with all the technical requirements of the code.... [T]he better [way] would have been for us to [have] traffic impact data and a commitment to needed improvements at the time we sit here for a rezoning. But that's a battle that's been lost.[20]

Moments later, when casting his vote in favor of the rezoning, Councilman Weiner stated: "I am voting yes because by my analysis to vote no would have [a] much more adverse traffic impact and land use impact upon the community and therefore I believe that it's more suitable to build a smaller shopping center thus I'm following the recommendation of the Land Use Department."[21] The Council voted to approve the rezoning by a vote of seven to six, making each vote in favor of the rezoning, including Councilman Weiner's vote, critical to the disposition.

In its post-trial opinion, the Court of Chancery held that, although the Council was not legally required to obtain the Traffic Information, in this case, the Council's vote in the absence of that information was arbitrary and capricious. The Court of Chancery found that, when the Council

18. *Id.* at A0334 (emphasis added).

19. *Id.* at A0336–37.

20. *Id.* at A01662–63 (emphasis added).

21. *Id.* at A0670.

voted on the rezoning, Councilman Weiner and other members of the Council believed that they were legally unable to obtain the Traffic Information, although in reality there were no legal obstacles preventing the Council from obtaining and considering that information before its discretionary vote on the rezoning ordinance.[22] Additionally, the Court of Chancery found that the Traffic Information was material to Councilman Weiner's vote and that he only voted without that information because he was mistakenly advised that it was unavailable to him. The Court of Chancery concluded that this mistake of law regarding the availability of the Traffic Information undermined the rezoning process and held that the Council's vote was:

> "arbitrary and capricious" under our law, because the dispositive vote of Councilman Weiner was cast in the absence of information, in the form of a traffic study, that the Councilman believed was material and potentially dispositive and which the Councilman could have obtained were it not for his misunderstanding of the law (presumably based on the incorrect advice of the

Planning Department and [Barley Mill] ).[23]

The Court of Chancery went on to explain that "[t]he record indicates that the only reason that Councilman Weiner voted without this information is because he was under the *mistaken* impression that there was *no legal way* for him to get the information at that stage of the plan approval process."[24] On that singular basis, the Court of Chancery invalidated the Council's vote on the rezoning ordinance.

### III. Analysis

■■■■ The decision of a County Council on a rezoning ordinance is presumed to be valid unless it is clearly shown to be arbitrary and capricious.[25] This Court reviews legal rulings, including the Court of Chancery's determination that the Council's zoning decision was arbitrary and capricious, *de novo*.[26] Although the role of a court in reviewing a zoning decision is limited and a court will not second-guess the Council's decision or substitute its own judgment for that of the Council, a court may set aside zoning actions that are arbitrary and capricious.[27] As this Court has explained:

22. Although Barley Mill's attorney told the Council that traffic information was not relevant to its decision and that the traffic information was unavailable to the members of the Council, Barley Mill did not even argue to the Court of Chancery that there was any legal barrier that would have prevented the Council from obtaining the information. *Save Our County, Inc. v. New Castle County*, 2013 WL 2664187, at *8 (Del.Ch. June 11, 2013) ("[A]t oral argument on the current motion, counsel for [Barley Mill] did not dispute that this view was in fact legally incorrect, and that there was no legal barrier preventing the Council from delaying its vote on the rezoning until after the completion of a traffic study or from considering that study as part of its deliberations."); *id.* at *9 ("There is simply no support for [Barley Mill]'s contention—made to the Council but *not* in this action—that [the consideration of traffic issues] was prohibited.") (emphasis in original).

23. *Save Our County, Inc. v. New Castle County*, 2013 WL 2664187, at *11 (Del.Ch. June 11, 2013).

24. *Id.* (emphasis added).

25. *Tate v. Miles*, 503 A.2d 187, 191 (Del. 1986); *Willdel Realty, Inc. v. New Castle County*, 281 A.2d 612, 614 (Del.1971).

26. *CCS Investors, LLC v. Brown*, 977 A.2d 301, 319–20 (Del.2009) (conducting a *de novo* review of the Superior Court's legal determinations and applying the same standard of review that was applied in the Superior Court to its review of a zoning board's decision).

27. *Tate*, 503 A.2d at 191; *Willdel Realty*, 281 A.2d at 614 ("[J]udicial review is available to rectify any zoning action shown to be arbitrary and capricious because [it is] violative of

[A] rezoning ordinance is usually presumed to be valid unless clearly shown to be arbitrary and capricious because it is not reasonably related to the public health, safety, or welfare. The burden of rebutting the presumption of validity and of showing that a rezoning is arbitrary and capricious is on those challenging the rezoning.[28]

A zoning action not taken in accordance with the law is arbitrary and capricious.[29] To enable courts to complete this review of zoning decisions, this Court has explained that "a valid zoning ordinance must be supported by a record sufficient to withstand judicial challenge" because "[u]nless [the] Council creates a record or states on the record its reasons for a zoning change, a court is given no means by which it may review the Council's decision." [30]

We agree with the Court of Chancery's determination that a mistake of law undermined the Council's deliberative process and therefore rendered its vote arbitrary and capricious. Throughout the entire re-

zoning process, Councilman Weiner and other members of the Council were advised that, as a result of a change in the UDC from a three-step to a two-step review process, the Traffic Information was not relevant to their decision and the Traffic Information was not available to them. But, as the Court of Chancery found and as Barley Mill acknowledges, the Second Plan was being reviewed under the three-step process, so even if those changes had the claimed effect, they still could not have prevented the Council from obtaining the Traffic Information. The record also supports the Court of Chancery's finding that Councilman Weiner and other members of the Council believed that the information was legally unavailable.[31]

This mistaken belief that the Council was legally prohibited from obtaining the Traffic Information undermined the rezoning process by causing the Council to vote without information that was material, relevant, and desired, at the very least, by

---

28. *Tate,* 503 A.2d at 191; *see also Willdel,* 281 A.2d at 614.

29. *Shevock v. Orchard Homeowners Ass'n, Inc.,* 621 A.2d 346, 349 (1993); *see also Deskis v. County Council of Sussex County,* 2001 WL 1641338, at *4 (Del.Ch. Dec. 7, 2001) ("[A]ny zoning action that is not in conformity with the law is considered to be arbitrary and capricious."); 83 AM.JUR.2D ZONING AND PLANNING § 32 (2013) ("[A] zoning action not taken in accordance with the law is deemed arbitrary and capricious.") (*citing Shevock,* 621 A.2d 346 (1993)); *accord Naugle v. O'Connell,* 833 F.2d 1391, 1393–94 (10th Cir.1987) ("A decision is neither arbitrary nor capricious if it is based on substantial evidence and is not the result of a mistake of law.").

30. *Tate,* 503 A.2d at 191.

31. Barley Mill argues that the Court of Chancery's conclusion that the Traffic Information was available to Councilman Weiner was er-

the requirement of reasonable relationship to the public health, safety, or welfare.").

roneous because Councilman Weiner did not have the unilateral authority to table the ordinance until the Traffic Information was provided. We find this argument unpersuasive. Barley Mill is correct that, under the Council's procedural rules, only the sponsor of the ordinance could have moved to table the ordinance and that a majority of the Council would have had to vote in favor of the motion in order for it to succeed. But, Barley Mill ignores the fact that Councilman Weiner cast a dispositive vote in this case and that, given the importance of his vote, he likely would have been able to persuade the other members of the Council to table the ordinance until the Council had received the Traffic Information. This is especially true because the record reflects that Councilman Street had also expressed a desire to receive the Traffic Information before the Council cast its discretionary vote on the rezoning ordinance and that the effect the Second Plan would have on traffic had been discussed extensively at each of the public hearings.

the Councilman who cast a dispositive vote on the rezoning ordinance. As the record reflects, traffic issues were discussed at every public meeting for which a transcript is available and the Council itself considered the Traffic Information to be relevant to its decision to approve the rezoning. Even after they were told that traffic issues were not relevant to the Council's decision and the Traffic Information was not available to them, members of the Council continued to ask questions related to traffic and to bemoan the lack of the Traffic Information. Councilman Weiner expressed his concern about the lack of Traffic Information moments before the vote was taken and mentioned the importance of traffic to his decision as he was casting his dispositive vote.

In the face of a factual record which adequately supports the Court of Chancery's determination that a mistake of law caused the Council to vote without important and material information, Barley Mill argues that the Court of Chancery overreached when it examined more than Councilman Weiner's final words on the day he cast his vote. Barley Mill argues that instead, under our decision in *Tate v. Miles*, the Court of Chancery should have limited its review of the record exclusively to Councilman Weiner's final statement when he cast his vote: "I am voting yes because by my analysis to vote no would have [a] much more adverse traffic impact and land use impact upon the community and therefore I believe that it's more suitable to build a smaller shopping center thus I'm following the recommendation of the Land Use Department." [32]

In *Tate,* this Court explained that "[u]nless [the] Council creates a record or states on the record its reasons for a zoning change, a court is given no means by which it may review the Council's decision." [33] And, in *New Castle County Council v. BC Development Associates,* we explained that "[w]hen [a] Council makes a rezoning decision without establishing the basis for its action, it thwarts the ability of a court to provide effective review." [34] If the Council does not either state the reasons for its decision on the record or create an adequate record for review, the Council's decision is invalid under *Tate.* Barley Mill argues that if the Council elects to fulfill *Tate's* requirements by stating the reasons for its decision on the record when the vote is taken, then reviewing courts must confine their review of the record solely to the final statements made by Council members immediately before they cast their votes. Thus, Barley Mill contends that the Court of Chancery could not even consider Councilman Weiner's statements bemoaning the absence of Traffic Information—which appear in the transcript a mere two pages before the motion to call the vote was made at the October 25, 2011 hearing [35]—because those words were not the final words spoken by Councilman Weiner when he voted. But, Barley Mill has not pointed to any judicial decisions, much less *Tate* itself, that so severely cramp the ability of reviewing courts to examine the record and we decline to do so here.

■ *Tate* did, however, make an important point about the role of a reviewing court when it recognized the need for the judiciary to respect the legislative process

---

**32.** Appendix to Barley Mill's Op. Br. at A0670.

**33.** 503 A.2d 187, 191 (Del.1986).

**34.** 567 A.2d 1271, 1276 (Del.1989).

**35.** *Compare* Appendix to Barley Mill's Op. Br. at A0662–63 (Councilman Weiner's statements), *with id.* at A0665–66 (motion to call the vote).

by being appropriately deferential in its review of elected officials when they make the difficult judgments entrusted to them.[36] Thus, when the Council provides reasons for its decision that are supported by the record and not the product of a legal error, reviewing courts should not substitute their own judgment for that of the Council.[37] But, in this case, traffic was a major concern of Councilman Weiner throughout the rezoning process, and he made plain his preference to have the Traffic Information moments before he cast his vote. The Court of Chancery did not err, therefore, when it reviewed the record and determined that the Council's decision was undermined by a mistake of law that caused Councilman Weiner to vote without the Traffic Information.

Assuming a situation where there had been no mistake of law, however, Barley Mill argues that Councilman Weiner's final statement gave a rational basis for his vote and thus, that the Court of Chancery erred when it concluded that the Council's vote was invalid. The problem with this argument is that it assumes away the central issue on which the Court of Chancery's analysis turned: that a mistake of law undermined the Council's deliberative process and forced Councilman Weiner to vote without information that, even if one looks only to the final statement he made when he cast his vote, was important to his decision.

■ The judiciary should be reluctant to set aside legislative votes and to give every reasonable benefit of the doubt to an elected official.[38] But the Court of Chancery's decision, at bottom, did not involve a determination that Councilman Weiner failed to articulate rational reasons for his affirmative vote. Instead, the Court of Chancery recognized that the Council engaged in a thorough and conscientious review of the information before it and thoughtfully considered the rezoning ordinance. Councilman Weiner rationally explained why he voted in favor of the rezoning ordinance after he had been told that the Traffic Information he sought was not available for him to consider before the vote. The Court of Chancery also recognized, however, that Councilman Weiner himself made it clear that he viewed the absence of the Traffic Information as dismaying and unfortunate given the important transportation issues posed by Barley Mill's plan to transform a relatively quiet office park with limited periods of traffic impact into a larger office park with a bustling regional shopping mall attached. But, because Councilman Weiner (and other members of the Council interested in the traffic issues) had received erroneous advice about what information was legally available to the Council before the vote, Councilman Weiner felt compelled to cast his vote on the more limited information that was before him. In other words, a mistake of law resulted in Councilman Weiner, and likely other Council members, being deprived of the opportunity to consider information that was objectively material before they made the important discretionary determination to approve a rezoning ordinance. The Court of Chancery, therefore, was correct to conclude that this mistake of law

---

36. *Tate*, 503 A.2d at 191 ("[I]f the reasonableness of a zoning change is 'fairly debatable', the judgment of Council must prevail, and the court will not substitute its judgment for Council's.").

37. In fact, blinding the reviewing court to other parts of the record, as Barley Mill advocates, might have the perverse effect of causing the invalidation of a vote simply because the rational basis for a vote had been made elsewhere in the process.

38. *Tate*, 503 A.2d at 191.

rendered the ultimate vote of the Council arbitrary and capricious.

Because the Court of Chancery considered the fact that Councilman Weiner had expressed a desire for the Traffic Information and that his statements revealed that the Traffic Information was material to his vote, Barley Mill also argues that the Court of Chancery incorrectly held that a Council's vote is arbitrary and capricious if the Council does not obtain all of the information that each Councilmember would like to have before the vote is taken. That mischaracterizes the Court of Chancery's opinion. The Court of Chancery did not hold that courts should set aside a legislative vote any time a member of the deliberative body expressed any desire to have some additional information before casting a vote. The Court of Chancery instead made a well-reasoned, case-specific ruling that was grounded in the undisputed facts in the administrative record. The Transportation Information Councilman Weiner sought was not relevant to him because of some personal curiosity; given the nature of Barley Mill's development plans and their obviously substantial effect on traffic in the surrounding community, the Traffic Information was objectively relevant to any reasonable legislator voting on the rezoning.

## IV. Conclusion

For the foregoing reasons, we affirm the Court of Chancery's determination that the Council's vote was rendered arbitrary and capricious because of the mistake of law that caused the Council to vote without obtaining information that was legally available to the Council and that was material to and desired by members of the Council, including Councilman Weiner, who cast a dispositive vote.

Because it is a trial court, the Court of Chancery understandably addressed the full range of issues presented to it so as to facilitate an efficient resolution to the case. One of these issues was the important question of whether § 2662 requires the Council to be provided with a traffic analysis before it votes on a rezoning ordinance.[39] It is unnecessary for us to reach that substantial question, however, and therefore we decline to address it and express no opinion on whether the Court of Chancery's statutory analysis was correct.[40] For similar reasons, we also do not

**39.** The Court of Chancery concluded that § 2662 only requires New Castle County to enter into an agreement with DelDOT to provide a procedure for DelDOT to analyze the traffic effect of a rezoning and that the statute does not require that the Council obtain or consider that traffic analysis. *See Save Our County, Inc. v. New Castle County*, 2013 WL 2664187, at *6 (Del.Ch. June 11, 2013). But the Court of Chancery's own reasoning suggests why the parties so strongly contest whether that conclusion was correct. The Court of Chancery's opinion acknowledged that § 2662 provides a procedure "so that the County Council may consider traffic before voting on a rezoning" and acknowledged that it was evident that the General Assembly "intended for the traffic information to be *avail-* able to the County Council." *See Save Our County, Inc. v. New Castle County*, 2013 WL 2664187, at *10 (Del.Ch. June 11, 2013) (emphasis in original). Moreover, other judicial decisions have read the language of § 2662 as requiring that whatever traffic analysis is required in connection with a rezoning proposal be provided to the Council before its discretionary vote on the rezoning ordinance. *See Deskis v. County Council of Sussex County*, 2001 WL 1641338, at *9 (Del.Ch. Dec. 7, 2001) (holding that 9 *Del. C.* § 6962, the statutory equivalent of § 2662 for Sussex County, "mandates that the County Council consider DelDOT's traffic analysis before deciding whether or not to rezone.").

**40.** *In re General Motors S'holder Litig.*, 897 A.2d 162, 167 (Del.2006) (declining to reach

reach the question of whether the UDC required the completion of a TIS before the Council's discretionary vote on the rezoning ordinance. Instead, we rest our affirmance solely on the same narrow ground on which the Court of Chancery itself premised its invalidation of the Council's rezoning vote and leave open the important questions of whether either § 2662 or the UDC requires a transportation analysis to be provided to the Council before its discretionary vote. By doing so, we give the appropriate legislative bodies an opportunity, in the first instance, to consider the multiple issues raised by the parties in this matter and to consider for themselves whether legislative action is advisable to provide greater clarity.[41] For the foregoing reasons, the judgment of the Court of Chancery is AFFIRMED.

the issues raised in a cross-appeal when the Court concluded that the Court of Chancery properly granted a motion to dismiss); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.,* 34 A.3d 1074, 1078 n. 4 (Del. 2011) (declining to reach appellee's alternative contention after affirming the Court of Chancery's determination on narrow standing grounds).

**41.** *Deptula v. Horace Mann Ins. Co.,* 842 A.2d 1235, 1236 (Del.2004) (addressing only the narrow issue presented and "leav[ing] for the General Assembly the task of clarifying the broader questions about the scope of" a statute the Court described as difficult to parse); *see also Scattered Corp. v. Chicago Stock Exch.,* 671 A.2d 874, 879 (Del.Ch.1994) (explaining that, where a case had revealed an anomaly in the statutory language, "it is appropriate that the General Assembly focus on this issue and determine whether there is any reason for that anomaly to persist."); *Shea v. Matassa,* 918 A.2d 1090, 1092 (Del.2007) (noting that "the parties raise controversial and competing public policy questions which the General Assembly can more effectively debate, consider and resolve through the legislative process" and deferring to the General Assembly).